David GROBOW, et al., Plaintiffs,

v.

H. Ross PEROT, et al., Defendants.

Beatrice L. RUSS, Plaintiff,

v.

Anne L. ARMSTRONG, et al., Defendants.

Bronson MURRAY, Plaintiff,

v.

Roger B. SMITH, et al., Defendants.

Civ.A. Nos. 8759, 8760 and 8765.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 9, 1987.
Resubmitted: March 31, 1987.
Decided: April 13, 1987.

---

Joseph A. Rosenthal, of Morris and Rosenthal, P.A., Wilmington, Robert A. Skirnick (argued), Klari Neuwelt and Ellen P. Chapnick, of Wolf Popper Ross Wolf & Jones, New York City, Arthur N. Abbey and Judith Spanier, of Abbey & Ellis, New York City, Stanley N. Wolfe, Gary E. Cantor, and Susan Schneider Thomas, of Berger & Montague, P.C., Philadelphia, Pa.; Stuart H. Savett and Barbara A. Podell, of Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa.; Lowell E. Sachnoff, Charles R. Watkins, and Joel N. Shapiro, of Sachnoff Weaver & Rubenstein, Ltd., Chicago, Ill.; Law Offices of Joseph E. Weiss, New York City; Stull Stull & Brody, New York City; Meredith & Cohen, P.C., Philadelphia, Pa.; Garwin Bronzaft & Gerstein, New York City; Harvey Greenfield, and Schoengold & Sporn, New York City, for plaintiffs.

William O. LaMotte, III and Thomas Reed Hunt, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Stephen C. Neal (argued) of Kirkland & Ellis, Chicago, Ill. for defendants General Motors Corp. and Electronic Data Systems Corp.

Michael J. Basford and Louis H. Lindeman, Jr., of General Motors Corp., Detroit, Mich., for defendant General Motors Corp.

E. Norman Veasey and Thomas A. Beck, of Richards, Layton & Finger, Wilmington, Dennis J. Block (argued), Irwin H. Warren, and Stephen A. Radin, of Weil, Gotshal & Manges, New York City, for Director defendants.

Bruce M. Stargatt and David C. McBride, of Young, Conaway, Stargatt & Taylor, Wilmington, M. David Bryant, Jr., of Hughes & Luce, Dallas, Tex.; Thomas D. Barr and Christopher M. Mason, of Cravath, Swaine & Moore, New York City, for defendant H. Ross Perot.

## OPINION

JACOBS, Vice Chancellor.

Presently pending are motions to dismiss in three [1] consolidated shareholder derivative actions on behalf of General Motors Corporation ("GM"), challenging a repurchase by GM of certain securities and notes issued to defendant H. Ross Perot ("Perot"), a member of GM's Board of Directors, and to other persons. Named as defendants in one or more of the actions (in addition to GM) are GM's individual directors, Perot, Electronic Data Systems ("EDS") and certain of EDS' directors. The plaintiffs seek various forms of relief based on claims that GM's directors breached their fiduciary duty to the corporation and its stockholders by approving the challenged transaction.

The defendants have moved to dismiss the derivative actions on the ground that the plaintiffs failed to comply with Court of Chancery Rule 23.1, by not making a demand on GM's Board of Directors to redress the wrongs complained of, and by not pleading with particularity facts which would establish that a demand would be futile. This is the decision of the Court,

---

1. A fourth action, *Nitekman v. General Motors Corporation, et al.,* Del.Ch., Civil Action No. 8762, was dismissed without prejudice following oral argument on the dismissal motions.

after briefing and oral argument, on the defendants' motion to dismiss.[2]

## I. *The Facts*

The pertinent facts, as alleged in the three complaints,[3] are as follows: In 1984 EDS became a wholly-owned subsidiary of GM as the result of a merger. (*Grobow* ¶ 13). At that time Perot was EDS' Chairman and its largest stockholder. (*Murray* ¶ 7). Under the terms of the GM/EDS merger, each EDS shareholder was given the choice of receiving, in exchange for his EDS shares, either $44 in cash or a combination of $35.20 in cash, plus .2 of a share of a newly issued GM Class E stock and a nontransferable contingent note maturing in 1991.[4] (*Grobow* ¶ 14, *Russ* ¶ 5, *Murray* ¶ 8). Perot chose the latter alternative. By virtue of the GM Class E shares that he received in the merger, Perot became GM's largest shareholder, owning .8% of its stock. (*Grobow* ¶ 18, *Russ* ¶ 5). Perot also became a member of GM's Board of Directors and continued to preside as Chairman of EDS. (*Grobow* ¶ 18, *Murray* ¶ 9).

GM's acquisition of EDS proved to be mutually beneficial to both corporations: EDS was able to offer GM a broad range of data processing and telecommunication systems, and GM, in turn, came to represent approximately 75% of EDS' total revenues. In addition, many GM suppliers became EDS customers. (*Grobow* ¶ 19, *Russ* ¶ 6, *Murray* ¶ 10).

Despite the early success of the combined GM/EDS entity, disagreements arose between the two companies over the pricing of EDS' services to GM and over certain long-term contracts that GM had allegedly promised to EDS. (*Grobow* ¶ 19). Perot was prepared to sue GM to obtain those contracts, and he warned GM's Board that, in his opinion, GM would be violating the securities laws if it did not make good on its promises to EDS' shareholders. (*Grobow* ¶ 20). In December, 1985, Perot was the lone dissenting vote in the Board of Directors' decision for GM to acquire Hughes Aircraft. (*Grobow* ¶ 21). Increasingly Perot became critical of GM's management, and he urged GM's Board to "do the fundamentals" required to recapture GM's competitive position. *Id.*

During the summer of 1986, Perot announced that he could no longer be a GM "company man." (*Grobow* ¶ 23). In June 1986, he wrote a letter to Roger Smith, GM's Chairman, demanding that GM either allow him to run EDS as he saw fit or buy him out. *Id.* Perot then began publicly to criticize GM. The *Wall Street Journal* quoted Perot as saying: "Until you nuke the old GM system, you'll never tap the full potential of your people," and "GM cannot become a world-class and cost-competitive company simply by throwing technology and money at its problems." (*Grobow* ¶ 24). Over the ensuing months, Perot persisted in his criticisms of GM's management, which became more pointed. (*Grobow* ¶ 25). GM's Board then caused GM to negotiate a possible sale of EDS to American Telephone and Telegraph Corp., allegedly (in part) to rid GM of Perot; however, those negotiations were unsuccessful. (*Grobow* ¶¶ 26, 27).

In the late fall of 1986, Perot told GM that he was willing to sell his interest in

---

2. At the oral argument, defendant Perot took no position on the merits of defendants' motion to dismiss. However, by letter dated February 9, 1987, Perot's counsel advised the Court that Perot would join in the dismissal motions. On March 9, 1987, one month after the dismissal motion had been submitted and while it was *sub judice,* the Grobow plaintiffs amended their complaint as of right. As a consequence of that amendment, supplemental memoranda were filed and the matter was resubmitted on March 31, 1987. The factual statement incorporates the pertinent allegations of the amended *Grobow* complaint.

3. References to the various complaints are as follows: *Grobow, et al. v. Perot, et al.,* C.A. No. 8759 (as amended) ("*Grobow* ¶ ____"); *Russ v. Armstrong, et al.,* C.A. No. 8760 ("*Russ* ¶ ____"); *Murray v. Smith, et al.,* C.A. No. 8765 ("*Murray* ¶ ____").

4. Dividends on the Class E stock are payable from GM's assets, but are declared on the basis of the net income of EDS. (*Grobow* ¶ 15). Each contingent note, on maturity, entitles the holder to the difference between (i) $62.50 and (ii) the then-current market price per share of Class E stock, for each Class E share received in the merger, plus "Special Interest" to offset certain federal tax consequences. (*Grobow* ¶ 14).

GM before the year-end. (*Grobow* ¶ 27). GM representatives responded with a proposal, and, at Perot's request, submitted to him a draft containing terms that Perot allegedly considered to be "unbelievable" and something that the Board "will never approve." (*Grobow* ¶ 28). Perot then proceeded to suggest additional, favorable terms for his representative to add to the agreement, including a "giant premium for [his] stock ... the right to hire the top 200 people from EDS ... [and] the right to start a new EDS...." [5] Perot is alleged to have reasoned that "no board of directors would ever buy a document like this." *Id.* GM's Board allegedly acceded to the terms demanded by Perot with "extraordinary speed," "little, if any study of [them]," and "no attempt to negotiate." (*Grobow* ¶ 29). In Perot's words, they "came back and agreed to all that." *Id.*

On November 30, 1986, a Special Review Committee consisting of three GM directors approved the buy-back proposal. (*Grobow* ¶ 29). GM's Board of Directors, a majority of whom were "outside" directors (*Russ* ¶ 3, *Murray* ¶ 3), approved the transaction at a meeting on December 1, 1986, which, as part of the arrangement, Perot was not invited to attend. (*Grobow* ¶ 29).

The terms of the repurchase approved by GM's directors (referred to in this Opinion as the "buy-back transaction") were as follows: GM paid Perot approximately $693 million to repurchase his Class E stock and to redeem his contingent notes. (*Grobow* ¶ 30). GM also repurchased the 800,000 shares of Class E stock, and the contingent notes, held by Perot's EDS associates. *Id.* The total cost of the buy-back transaction to GM was $742.8 million,[6] which Perot reportedly characterized as including a "gi-

ant premium" paid to him. (*Grobow* ¶¶ 30, 31).

As part of the buy-back transaction, Perot also gave GM certain covenants. He agreed to refrain from criticizing GM management, and to pay liquidated damages of up to $7.5 million, if that covenant were found to have been violated. (*Grobow* ¶ 32). He agreed, for stipulated periods of time, to refrain from purchasing GM stock, from starting a business that would compete with EDS (for three years), and from recruiting EDS executives to another company (for 18 months). (*See* n. 5, *supra; Grobow* ¶¶ 32, 33, *Russ* ¶ 10, *Murray* ¶ 15). Finally, Perot agreed to (and did) resign from GM's Board of Directors and as EDS' Chairman. (*Grobow* ¶ 32, *Russ* ¶ 10, *Murray* ¶ 15).

After GM announced the buy-back transaction, Perot advised the GM Board that he was placing his share of the cash proceeds into escrow until December 15, 1986, to give the Board an opportunity to "review this matter and the events that led to the decision." (*Grobow* ¶ 58, *Russ* ¶ 17, *Murray* ¶ 21). Despite Perot's invitation to reconsider, the GM Board announced that it did not intend to rescind the agreement. (*Grobow* ¶ 58, *Russ* ¶ 21, *Murray* ¶ 25). Despite protest from GM constituencies, the Board has adhered to that position. (*Grobow* ¶ 59).

The buy-back transaction has been a subject of criticism by GM top management and by industry analysts (*Grobow* ¶¶ 39, 40), and it came at a time when GM had been experiencing financial set-backs and engaging in severe cost-cutting. (*Grobow* ¶¶ 38, 43, *Murray*, ¶ 20). The plaintiffs charge that the buy-back transaction had no valid corporate purpose (*Grobow* ¶ 42), that it constituted a waste of corporate

---

**5.** The complaints do not allege that those specific terms were ever actually incorporated in the agreement. Moreover, the *Grobow* complaint suggests the contrary, *i.e.*, it alleges that Perot agreed not to start a competing business for three years or to recruit certain EDS employees to another company for eighteen months. (*Grobow* ¶ 33).

**6.** Of the aggregate cost of $742.8 million, $396 million ($33 per share) was attributed to the

Class E stock, $282 million ($23.50 per share) was attributed to the contingent notes, and $64.8 million ($5.40 per share) was attributed to "Special Interest" federal tax compensation under the terms of the contingent notes. (*Grobow* ¶ 30). The total "Sell-Out Price" of $61.90 per share is alleged to be nearly double the closing market price of the Class E stock on the last trading day before the repurchase. (*Grobow* ¶ 31).

assets (*Grobow* ¶¶ 43, 61, *Russ* ¶ 23(a), *Murray* ¶ 27(a)), and that it amounted to a breach of the GM directors' fiduciary duties.[7] (*Grobow* ¶¶ 41, 44, *Russ* ¶ 23, *Murray* ¶ 27).

## II. *The Contentions and Applicable Legal Principles*

It is undisputed that the plaintiffs made no prior demand on GM's Board of Directors to redress the acts complained of. Plaintiffs allege, however, that any demand would have been futile, and their complaints collectively recite ten separate grounds to support that position.[8] In support of their motion to dismiss, the defendants maintain that as a matter of law, none of the pleaded futility grounds, whether taken singly or together, excuse the requirement of a demand under Chancery Rule 23.1.

■ The starting point of any demand-futility analysis is *Aronson v. Lewis*, Del. Supr., 473 A.2d 805 (1984), which mandates a two-pronged test for demand futility. Under *Aronson* the complaint must allege particularized facts creating a reasonable doubt that: "1) the directors are disinterested and independent and 2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814; *Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 624 (1984). Thus, under *Aronson's* first prong,

the inquiry is whether the particularized allegations of the complaint create a reasonable doubt that the directors were disinterested and independent. Under the second prong, the question is whether the particularized allegations create a reasonable doubt that the transaction, viewed substantively, was the product of a valid exercise of business judgment. If under either prong a reasonable doubt is found to exist, demand is excused as futile. *Aronson*, 473 A.2d at 814–15; *Pogostin*, 480 A.2d at 624–25.

■ The Delaware Supreme Court has not defined what degree of particularized factual specificity is required to establish a "reasonable doubt" sufficient to excuse a demand. Nor, given the fact-specific nature of an *Aronson*-based determination, would a general formularization (assuming one is possible), be easy to accomplish. This much, however, can be said: for a derivative action to survive a motion to dismiss under Rule 23.1, the pleading requirements are more stringent than they would be on a motion to dismiss for failure to state a claim under Rule 12(b)(6). On a Rule 12(b)(6) motion, it is sufficient under our system of notice pleading that the elements of the claim be averred generally, except in those few situations where the Rules require particularized pleading, *e.g.*,

7. The plaintiffs charge Perot with having breached his fiduciary duty to GM and its shareholders (*Grobow* ¶ 45) and with aiding and abetting the GM directors' breach. (*Russ* ¶ 26). Perot and his associates who participated in the buy-back are also charged with having breached their fiduciary duties to EDS. (*Grobow* ¶ 57).

8. Plaintiffs' grounds for demand-futility are: (1) the GM directors were incapable of exercising a disinterested and independent business judgment in considering a demand, because the sole or primary purpose of the buy-back transaction was to protect the directors' reputations and positions by silencing Perot's criticism (*Grobow* ¶¶ 34, 60, *Russ* ¶ 29(d), *Murray* ¶ 5(f)); (2) the buy-back transaction served to perpetuate the GM directors' lucrative positions by barring Perot from any future takeover attempt (*Russ* ¶ 29(e), *Murray* ¶ 5(g)); (3) GM's directors were dominated by, and under the control of, GM's management (*Murray* ¶ 5(e)); (4) the entire Board (or a majority, *Murray* ¶ 5(b)) "participated in, authorized or acquiesced in," or was responsible for, the challenged transaction (*Gro-*

*bow* ¶ 60, (*Murray* ¶ 5(b)); (5) GM's directors would be required to bring an action against themselves, with the result that the lawsuit would be left in hostile hands and not diligently prosecuted (*Grobow* ¶ 60, *Murray* ¶ 5(c), (d), *Russ* ¶ 29(c)); (6) the GM directors have already publicly announced that they would not rescind the buy-out agreement (*Grobow* ¶ 58, *Murray* ¶ 5(a)), thus anticipatorily rejecting any demand by plaintiff (*Russ* ¶ 29(a)); (7) the GM directors failed to exercise business judgment in negotiating (or failing to negotiate) the buy-back (*Grobow* ¶ 61); (8) viewed substantively, the buy-back is so egregious on its face that it could not have been the product of an independent business judgment (*Grobow* ¶ 61, *Russ* ¶ 29(f)); (9) the buy-back constitutes waste (*Grobow* ¶ 61, *Murray* ¶ 5(h)); and (10) the buy-back provision indemnifying Perot from liabilities and expenses arising from derivative actions establishes that any demand would be futile. (*Grobow* ¶ 62).

Chancery Rule 9(b) (fraud or mistake). But on a motion to dismiss a derivative complaint under Rule 23.1, *Aronson* requires particularization of all factual allegations that will be relied upon to support a claim of director interest, director nonindependence, or the inapplicability of the business judgment rule to the transaction viewed substantively. Under *Aronson*, the degree of factual particularization must be sufficient to create a "reasonable doubt" on one or more of those issues. 473 A.2d at 814–15. The standard for determining "reasonable doubt" for *Aronson* purposes has not yet been defined, and I do not presume to define it here. But whatever that standard might be, I am satisfied that it would be met if the plaintiff pleads particularized facts (as opposed to evidence, *see id.* at 816), which, if taken as true, would support a judicial finding, based on applicable legal principles, of director interest, director nonindependence, or transactional nonprotection under the business judgment rule. That is the perspective in which the plaintiffs' futility contentions will be evaluated on the instant motions.

### III. *Director Disinterest and Independence*

#### A. *Director Disinterest*

In *Aronson*, the Supreme Court has stated that:

> [D]irectors can neither appear on both sides of the transaction nor expect to derive any personal financial benefit

from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.

473 A.2d at 812.

In this instance, the plaintiffs do not predicate their claim of director interest on the theory that the GM Board received a direct financial benefit from the buy-back transaction.[9] Rather, they contend that the GM directors stood "on both sides of the transaction" because of their interest in silencing Perot's public criticisms which, the directors feared, would eventually result in their being swept out of office by force of public opinion. In short, the directors' alleged interest is said to be one of self-perpetuation in office.[10] In support of their position the plaintiffs rely on two decisions by this Court, *Good v. Texaco, Inc.*, Del.Ch., C.A. No. 7501, Brown, C. (May 14, 1984) and *Moran v. Household International Inc.*, Del.Ch., 490 A.2d 1059 (1985), *aff'd on other grounds*, Del.Supr., 500 A.2d 1346 (1985), and a recent decision by the Southern District of New York, *Samuel M. Feinberg Testamentary Trust v. Carter*, 652 F.Supp. 1066 (S.D.N.Y.1987).

■ In my view, the plaintiffs' theory of director interest is unsupported both in law and by the facts pleaded in the derivative complaints.

To begin with, plaintiffs' authorities do not support their theory. In *Good v. Texaco, supra*, the Board of Directors of Texaco, Inc. approved an agreement whereby

---

9. In that respect, all that the complaints allege is that the directors received significant fees and perquisites for their services. (*Grobow* ¶ 8(a), (c), *Russ* ¶ 3(u) (listing non-employee directors fees)). That allegation is legally insufficient to excuse demand. *See In re E.F. Hutton Banking Practices Litigation*, 634 F.Supp. 265, 271 (S.D.N.Y.1986) (applying Delaware and federal law); *see also* n. 12, *infra*.

10. The theory finds its best expression in paragraph 34 of the *Grobow* amended complaint, which pertinently alleges that:

> The GM defendants viewed Perot's public criticisms of their management of GM as a violation of the GM de facto corporate code which posed a threat to their reputations, Board room tranquility and their continued positions and remuneration. Throughout the events described above, they acted for their own purpose of silencing their powerful in-house public critic so as to end their loss of face before the GM constituencies and remove any threat or potential threat to their domination and control of the affairs of GM.... The GM Board negotiated with urgency only when Perot took his criticism public and aimed squarely at the GM Defendants themselves. Once Perot took his views beyond the board-room doors, he threatened all Board members' reputations among the GM constituencies, their perquisites of office, their domination and control of GM and, ultimately, their positions. With power and prestige, positions and perquisites under challenge—and for no other reason—the GM Board rushed to pay almost three-quarters of a billion dollars to make Perot go away and be quiet.

Texaco repurchased a 9.7% block of its own stock from Bass Brothers Enterprises. Texaco's directors were concerned about a possible takeover by Bass Brothers, which previously had expressed an interest in possibly acquiring control. *Good, supra,* at 6–7. Before the repurchase, Texaco's directors collectively owned 0.3% of its outstanding shares. Under the repurchase agreement the directors would have had the right to vote approximately 5% of the corporation's outstanding shares. *Id.* at 7–8. In a derivative action challenging the transaction, former Chancellor Brown held that a demand was excused, finding that "[t]he interestedness charged to the directors is that they have benefitted personally from the transaction complained of by acquiring at corporate expense the right to control the vote of corporate shares which they do not own." *Id.* at 10. That self-interest was "compounded" by the fact that at an upcoming stockholders meeting the Board would be able to vote those shares in favor of certain director-recommended amendments to Texaco's certificate of incorporation, which, if approved, would have made the directors' removal from office, or any takeover, more difficult. *Id.*

In *Moran v. Household International Inc., supra,* the directors of Household International Inc., concerned that their corporation was vulnerable to a takeover, adopted a Rights Plan as a preventive mechanism to deter future unfriendly takeover advances. Holding that demand was excused, Vice Chancellor (now Justice) Walsh found that:

> [T]he plaintiffs' complaints, which set forth particularized facts alleging that the Rights Plan deters *all* hostile takeover attempts through its limitation on alienability of shares and the exercise of proxy rights, sufficiently pleads a primary purpose to retain control, and thus casts a reasonable doubt as to the disinterestedness and independence of the board....

*Household,* 490 A.2d at 1071 (emphasis in original).

In both *Good* and *Household,* the board of directors approved a transaction or corporate structural arrangement that would have conferred upon themselves a direct, tangible power either to block or obstruct any threat to their continued incumbency posed by a hostile takeover. This was done at a time when the directors were concerned about the corporation's vulnerability to a takeover. In both cases the directors' conferral upon themselves of a form of "blocking" power that would have tended to perpetuate them in office is what was found to create the disqualifying self-interest.

In these actions, however, plaintiffs do not allege that GM's Directors believed themselves vulnerable to removal from office by reason of a takeover planned by Perot or anyone else.[11] *Compare Good, supra,* at 6–10; *Household,* 490 A.2d at 1071. Nor would the particularized pleaded facts support any such suggestion. Perot held less than 1% of GM's voting stock, and it is not claimed that he intended to acquire control of GM. In addition, GM's directors received nothing from the buyback transaction either in the form of enhanced voting power, "blocking power," or any other direct, tangible control-related benefit that would have facilitated their

---

11. In this context the plaintiffs repeatedly emphasize Perot's agreement not to attend the December 1, 1986 directors meeting at which the buy-back transaction was approved. They argue that Perot's absence from that meeting was intended to prevent him from voicing certain unwelcome positions. But the *Grobow* complaint does not allege that the Board insisted upon Perot's absence for the purpose of silencing his criticisms. It avers only that Perot told the *New York Times* that he had advised the GM Board of his intention to confront them over unresolved issues between EDS and GM, and over the Board's award of over $1 million dollars in year-end bonuses to GM executives. (*Grobow* ¶ 27). Even if silencing Perot is assumed to be the reason for his being excluded from the meeting, that fact is not relevant to plaintiffs' theory of director disinterest, because the issues that Perot reportedly intended to raise were not of such a nature as to create a threat to the directors' incumbency. Moreover, given Perot's clear financial self-interest in the matter to be considered and voted upon, it has not been shown that GM's directors acted improperly in insisting that Perot not be present. *Cf. 8 Del.C.* § 144.

self-entrenchment. Accordingly, the complaints in these actions do not furnish a basis for invoking the rationale of *Good* or *Household.*

The plaintiffs contend, nonetheless, that to establish a disqualifying director interest, it is not essential that the Board receive an ongoing structural voting advantage or blocking power. It is enough, they say, if the transaction, even on an *ad hoc* basis, eliminates a clear threat to the directors' control. Plaintiffs suggest that because its result was to eliminate Perot from the GM picture, the buy-back transaction was of that character. For that proposition they rely upon *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066 (S.D.N.Y.1987) (*"Feinberg"*) where a corporate repurchase of a significant block of stock at a 25% premium was found to create a disqualifying director interest sufficient to excuse a demand.

█ Assuming without deciding that plaintiffs' alternative theory is legally valid, they have failed to establish, either factually or legally, that their theory would be applicable in this case. In *Feinberg,* the directors of B.F. Goodrich Company ("Goodrich") authorized the repurchase, at a 25%–above-market premium, of a 4.9% block of stock held by Mr. Carl Icahn, who had publicly announced his intent to acquire up to 30% of Goodrich's stock in an effort to obtain control. The District Court determined that the primary purpose for the repurchase was the Goodrich directors' desire to retain their positions and that that motive, under the "atypical" circumstances,

was sufficient to establish the requisite adverse director interest.[12] The *Feinberg* court found that no facts were alleged that demonstrated a proper business justification for the transaction or that Icahn's removal would so improve the company's financial position as to justify an $8 million premium. Moreover, and of considerable significance, the Goodrich directors had failed to disclose the Icahn repurchase (and had misrepresented that transaction) in proxy materials sent to shareholders, causing the District Court to observe that, had the directors believed that the Icahn transaction represented "an appropriate expenditure of corporate funds, one would have expected [them] to announce the full details ... to shareholders." 652 F.Supp. at 1074.

Thus, *Feinberg* involved circumstances not present here: a specific, concrete threat to the directors' continued control, and an entrenchment (as contrasted with a business) motive, for the repurchase transaction. In this case, no specific, concrete threat to the GM Directors' incumbency, originating from Perot or from some other quarter, is alleged. The allegation that GM's directors feared that adverse public opinion might (in some unspecified way) cause their ouster from office is based upon supposition, not fact. Such a concern, in the circumstances pleaded here, is too speculative and remote to support a finding that the GM directors' approved the buy-back transaction for the sole or primary motive of entrenchment.[13] To the

**12.** *Feinberg* held that the compensation paid to Goodrich's directors—at least $20,000 annual salary and (for directors who served at least 5 years), a yearly pension equal to at least one half of the director's compensation during his last year on the Board—was at a level sufficient to establish the directors' financial interest in retaining their positions. *Feinberg,* however, was not decided under Delaware law. In a decision by that same court the year before, which did apply Delaware law, the Southern District held that the "[r]eceipt of directors' fees does not suggest a conflict of interest. If it did, every director who receives a director's fee would be biased." *In Re E.F. Hutton Banking Practices Litigation,* 634 F.Supp. 265, 271 (S.D.N.Y.1986). That approach is sound and correctly states Delaware law as I understand it. *See*

*Pogostin,* 480 A.2d at 624. It should be noted, however, that the rule that receipt of customary directors' fees does not create a disqualifying interest is one involving the application of a presumption (*i.e.,* the presumption of director disinterest). It is not an unvarying principle that mechanically applies irrespective of the circumstances. Conceivably a situation might arise where directors' compensation, in the form of "directors' fees," becomes so lavish that a mechanical application of the presumption would be totally at variance with reality. Needless to say, no such case is alleged in the complaints in these derivative actions.

**13.** Plaintiffs' theory of director disinterest implicitly rests upon the proposition that public criticism of a corporation's management oper-

contrary, the complaints plead facts that evidence a variety of business motivations for approving the transaction. *See* Section IV B, *infra.*

For the above reasons, the complaints do not create a reasonable doubt as to the GM directors' disinterestedness at the time they approved the buy-back transaction.

### B. *Director Independence*

The complaints also aver that the GM directors lacked independence because they were dominated and controlled by GM's management, which was seeking to entrench itself. (*Murray* ¶ 5(e)).

On the subject of director independence, the Supreme Court in *Aronson* has stated:

[A] plaintiff charging domination or control of one or more directors must allege particularized facts manifesting "a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling."

473 A.2d at 816 (citations omitted).

■ The allegation of director "nonindependence" in this case is conclusory and without particularized factual basis. The complaints assert that the directors were dominated. But they allege no particularized supporting facts; that is, they do not show specifically how GM's "outside" directors, who comprise the majority of the Board and who, therefore, were presumptively independent, were dominated and controlled by the "inside" directors. Thus, no facts are pleaded that would raise any doubt, let alone a reasonable doubt, as to the outside directors' ability to act independently of management. *Aronson* 473 A.2d at 816; *see also Stein v. Orloff*, Del.Ch., C.A. No. 7276, Hartnett, V.C. (May 30, 1985), at 10, *appeal denied*, Del.Supr., 504 A.2d 572, Horsey, J. (1986) (order).

### C. *Other Allegations*

■ Finally, the plaintiffs rely upon three other circumstances that, they claim, establish the futility of a demand. Plaintiffs allege that (i) a majority of GM directors participated in, authorized or acquiesced in the challenged transaction; (ii) the directors would be required to sue themselves, thereby placing the lawsuit in hostile hands; and (iii) the directors' refusal to rescind the buy-back agreement, even after Perot announced that he was placing the funds in escrow to afford them an opportunity to reconsider, establishes demand futility. None of these contentions is legally sufficient.

■ It is now well-settled that an allegation that a majority of directors approved, participated, or acquiesced in a challenged transaction will not, in and of itself, establish demand futility. *Aronson*, 473 A.2d at 817; *Kaufman v. Belmont*, Del.Ch., 479 A.2d 282, 287 (1984); *Lewis v. Daum*, Del. Ch., Civil Action No. 6733, Brown, C. (May 24, 1984), at 3–5. The claim that the directors would be required to sue themselves, or that any action brought would be in hostile hands and not diligently prosecuted, has also been rejected by the Delaware Supreme Court and this Court. *See Aronson*, 473 A.2d at 818; *Pogostin*, 480 A.2d at 625; *Lewis v. Daum, supra*, at 7. Lastly, the directors' alleged refusal to reconsider their decision when Perot offered to place the purchase price for his stock in escrow, will not, without more, establish futility. If the directors were disinterested and independent at the time they initially approved the buy-out transaction, they would not become any less disinterested or independent by having voted to approve the transaction. *See Aronson*, 473 A.2d at 817; *Pogostin*, 480 A.2d at 627; *Kaufman v. Belmont*, 479 A.2d at 288. By the same token, the directors' later refusal to revisit that decision will not operate to downgrade

ates as a threat to the directors' continued incumbency. The argued-for linkage between public criticism and a challenge to Board control is far from self-evident, and appears to be improbable and, in many cases, contrary to experience. Even assuming (*arguendo*) that a set of circumstances might be hypothesized in which public criticism of directors could result in a challenge to their control, reliance upon such a cause and effect relationship to establish director interest would require significantly more particularized facts than have been pleaded here.

their status to that of interested or dominated directors.[14]

\* \* \* \* \* \*

The complaints do not create a reasonable doubt as to the directors' disinterest or independence when they approved the buy-back transaction. Therefore, demand futility has not been established under the first prong of *Aronson.*

### IV. *Whether the Transaction Was Otherwise the Product of a Valid Exercise of Business Judgment*

Under the second prong of *Aronson* the inquiry is whether a reasonable doubt exists that the transaction, viewed substantively, was the product of a valid exercise of business judgment. In making that inquiry, "[the] court does not assume that the transaction was a wrong to the corporation requiring corrective measures by the board." *Pogostin,* 480 A.2d at 624.

In support of their contention that the buy-back transaction was not the product of a valid business judgment, plaintiffs attack the process by which the transaction was negotiated and received Board approval as well as the transaction's substantive terms. Specifically, the plaintiffs argue that (i) in negotiating and considering the transaction, the GM directors were grossly negligent, and thereby failed to exercise their business judgment, and (ii) the substantive terms of the transaction itself independently create a reasonable doubt that the transaction would not be protected under the business judgment rule.

Those arguments are now separately addressed.

### A. *Process-Related Contentions*

The plaintiffs process-related arguments are rooted in paragraphs 27–29 of the amended *Grobow* complaint. Plaintiffs allege that after Perot wished to sell his interest in GM before year-end, negotiations ensued wherein Perot demanded terms that were quite favorable to him, and asked his lawyer to suggest terms to which GM's directors would never agree, *e.g.* a "giant premium", the "right to hire the top 200 people from EDS ... the right to start a new EDS, and on, and on, and on...." (*Grobow* ¶ 28). The complaint further alleges that "no director of GM ever asked [Perot] a single question," there was "no attempt to negotiate with Perot," and the Board responded with "extraordinary speed and little, if any, study of the terms demanded by Perot." (*Grobow* ¶ 29). Relying upon *Smith v. Van Gorkom,* Del. Supr., 488 A.2d 858 (1985), and *Tomczak v. Morton Thiokol, Inc.,* Del.Ch., Civil Action No. 7861, Hartnett, V.C. (May 7, 1986), the plaintiffs urge (in so many words) that these allegations create a reasonable doubt that GM's directors were grossly negligent in approving the buy-back transaction, and, consequently, a reasonable doubt that the transaction was the product of a valid business judgment.

■ Thus, the plaintiffs focus upon two process-related deficiencies: the absence of arm's length negotiation and the absence of appropriate Board deliberation. I am persuaded that neither "process" argument is sufficiently supported to excuse demand.

■ The first argument—that GM acceded to Perot's demands without prior negotiations—is contradicted by the *Grobow* complaint which alleges that there were negotiations, starting with Perot's suggestion that GM buy him out. The negotiations were interrupted by GM's intervening negotiations with AT & T for the sale of EDS, but then resumed in earnest in November, 1986 when Perot's counsel advised GM that Perot wanted to sell before year-end for tax reasons. (*Grobow* ¶¶ 23, 26, 27). This final process is said to have involved at least one exchange of draft

---

**14.** In that same vein, plaintiffs contend that demand-futility is established by the fact that GM agreed to indemnify Perot against liability or expense arising out of lawsuits brought in connection with the buy-back transaction. (*Grobow* ¶ 62). I conclude otherwise. Indemnification as an adjunct to a business transaction is not illegal or necessarily imprudent.

*Good v. Getty Oil Co.,* Del.Ch., 514 A.2d 1104, 1108 (1986). The corporation's obligation to indemnify a director is not unlimited. *See* 8 *Del.C.* § 145. Accordingly, it would be incorrect to conclude that the mere presence of the indemnity provision in the buy-out agreement would preordain that the Board would reject a demand that otherwise had merit.

agreements and proposed terms between representatives of GM and Perot.[15] (*Grobow* ¶ 28). Moreover, the complaint contradicts the suggestion that GM supinely acceded to all of Perot's demands; despite such demands, Perot ultimately agreed not to hire away top EDS employees or to start up a competing company. *See* n. 5, *supra.* In determining whether the pleaded facts create a reasonable doubt on a given issue, *all* of the pleaded facts, not just those selected by one of the parties, must be considered. On that basis the instant pleaded facts would not support a finding (and therefore do not create a reasonable doubt) that GM's directors acceded to Perot's demands without prior negotiation.

The plaintiffs' second process-related contention—that GM's directors acted with extraordinary speed and with very little study of its terms—also ignores contrary pleaded facts and is otherwise lacking in support. A Special Review Committee of GM's Board, chaired by one of the outside directors, was created, and that committee met the day before the December 1, 1986 Board of Directors meeting, specifically to consider the proposed transaction with Perot. It is not alleged that the committee failed to consult with and consider the views of financial or legal advisors before recommending to the full Board that it approve the transaction. Nor is it alleged that the committee failed to report its

analysis to the full board. Therefore, plaintiffs' second process argument seems to rest largely upon conclusory allegations, not upon particularized pleaded facts that would support a finding (solely for purposes of these motions) that the Board was prevented from making, or did not make, an informed business judgment on the merits of the challenged transaction.[16]

### B. *Substance-Related Contentions*

Finally, the plaintiffs challenge the substance of the buy-back transaction itself, as being "so egregious as to be afforded no presumption of business judgment protection." (*Grobow* ¶ 61). Specifically, plaintiffs claim that (i) the total size of the transaction in relation to GM's financial difficulties, coupled with the "giant premium", constituted "prima facie waste," (ii) the early redemption of the contingent notes from Perot and the other EDS defendants, and the "giant premium," constituted an improper preference to them over the other GM security holders, (iii) the corporate offices of Perot and the other EDS defendants were "purchased," and (iv) the buy-out violated the public policy of Delaware and of New York.

Reduced to its essence (and shorn of conclusory rhetoric), the challenged transaction may be viewed simply as a repurchase by a corporation, for a substantial consideration, of a large block of its own

---

**15.** The suggestion that the process was faulty because GM's Board did not negotiate directly with Perot is not supported by legal authority and ignores the realities of corporate governance. Transactions involving corporate assets are normally negotiated by management, counsel, or other designated corporate representatives, not by the directors themselves. No Delaware authority has been brought to the Court's attention that would require the Board itself to engage in face-to-face negotiations.

**16.** Nor do *Smith v. Van Gorkom, supra,* or *Tomczak v. Morton Thiokol, supra,* support the plaintiffs' "gross negligence" argument. In *Van Gorkom,* the directors had failed to inform themselves of available information going to the heart of the transaction, *viz,* the determination of the merger price. Moreover, they had not considered any expert opinion or study of the value of the company, and (in contrast to the facts alleged here), had not sought the prior consideration and recommendation of the pro-

posed merger by a special committee of the board. *See Smith v. Van Gorkom,* 488 A.2d at 874–80. In *Morton Thiokol,* a derivative action attacking a sale of one of the corporation's divisions, this Court held that demand was excused, because: (i) only two of Morton Thiokol's twelve directors had any real notice of the proposed transaction before the meeting at which the transaction was approved; (ii) the transaction was approved immediately, although there was no emergency requiring that that be done; (iii) the outside directors had only two short oral presentations to guide them when they approved the sale; (iv) no one on the Board questioned, nor were they apprised of, the basis of the retained investment bankers' valuations of the assets being sold; and (v) the directors ignored obvious opportunities to obtain a higher price. *Morton Thiokol, supra,* at 7–8. The circumstances that were found to excuse demand in *Morton Thiokol,* and which resulted in a finding of gross negligence in *Van Gorkom,* are not presented here.

securities held by a stockholder who is publicly at odds with management policy. As part of the transaction, the corporation also acquired from the dissident stockholder certain undertakings or covenants, including a covenant not to compete for 3 years, a covenant not to recruit EDS executives for 18 months, and a covenant to refrain from publicly criticizing GM's management (the so-called "hushmail" provision). (*Grobow* ¶ 32, *Russ* ¶ 10, *Murray* ¶ 15).

 When viewed strictly in conceptual, business judgment terms, there is little that is remarkable about the transaction other than its magnitude and its notoriety in the public media. The one arguably unique feature of the repurchase is its "no-public criticism" (the so-called "hushmail") provision. Putting that provision momentarily to one side, the buy-back transaction appears indistinguishable from other repurchases by a corporation, at a premium over market, of its own stock held by a single dissident shareholder or shareholder group at odds with management, that have repeatedly been upheld as valid exercises of business judgment.[17] *See Polk v. Good,* Del.Supr., 507 A.2d 531 (1986); *Cheff v. Mathes,* Del.Supr., 199 A.2d 548 (1964); *Edelman v. Phillips Petroleum Co.,* Del. Ch., Civil Action No. 7899, Walsh, V.C. (February 12, 1985); *Lewis v. Daum,* Del. Ch., Civil Action No. 6733, Brown, C. (May 24, 1984); *Kaplan v. Goldsamt,* Del.Ch., 380 A.2d 556 (1977); *Kors v. Carey,* Del. Ch., 158 A.2d 136 (1960). Under the cited authorities, even if the repurchase involves the payment of a premium and even if its motivation is to eliminate a threat to the corporate enterprise created by a substantial dissident stockholder, the repurchase is protected by the business judgment rule, unless it involves fraud or unfairness, or its primary or sole purpose is to entrench the directors in office. *Polk v. Good,* 507 A.2d at 536–37. As stated by this Court in *Lewis v. Daum, supra,* at 6:

[A] stock repurchase is not rendered illegal simply because the motivation for the repurchase is to eliminate a substantial number of shares held by a stockholder at odds with management policy, provided that the transaction is clear of any fraud or unfairness.... Thus, I think it fair to say that the specific allegation in the complaint that a premium was paid to repurchase shares ... does not automatically state a wrong in Delaware without more....

In this case the plaintiffs do not rely upon or argue a theory of fraud, and the complaints have been found not to support their contention that the sole or primary purpose of the buy-back transaction was director entrenchment. (*See* Part III A, *supra*). Therefore, unless the transaction is unfair, it would be protected by the business judgment rule. And that would be so even if the directors' judgment turned out to be wrong; that is, even if, given GM's other financial difficulties, it later developed that there were wiser business uses to which the $700 million might have been devoted.

The pivotal question thus becomes whether the transaction, as described by the particularized pleaded facts, is unfair. In that respect the so-called "hushmail" provision becomes pertinent, because it appears to be the unique feature of the transaction and the focal point of the plaintiffs' substantive attack upon it. Plaintiffs claim that the transaction had no valid corporate purpose because its primary, (if not sole) purpose was to buy Perot's silence, and that since a "giant premium" paid was by GM to Perot for no valid business purpose, it constituted waste and, hence, was unfair.

The difficulty with this argument is that it overlooks other pertinent, contradictory allegations. The complaints themselves allege several and varied elements of consideration that GM received in addition to the "no-criticism" covenant. Thus, of the $61.90 total value paid by GM for each share of the Class E stock and the corresponding contingent notes, $33 was allocat-

---

**17.** That Perot was a director of GM does not change the analysis. A director may in good faith deal freely with and dispose of his stock, and is also free to resign. *Frantz Manufacturing Co. v. EAC Industries,* Del.Supr., 501 A.2d 401, 408 (1985).

ed to the discounted repurchase of the stock, $23.50 was allocated to the repurchase of the contingent notes (which GM remained obligated to pay), and $5.40 was allocated to special interest tax compensation required by the terms of those notes. (*See* n. 6, *supra*). Moreover, none of the foregoing includes or takes into account the value to GM of Perot's covenant not to compete, his covenant not to hire EDS employees, or his agreement to remove himself from GM's and EDS' affairs.

■ In light of these pleaded facts, the contention that GM paid an "enormous premium" over the market price of the repurchased stock to buy Perot's promise of silence is not adequately supported to excuse a demand. To allege a claim of waste sufficient to satisfy the criteria of *Aronson* and Rule 23.1, the particularized pleaded facts must show that the consideration received by GM in the transaction "was so inadequate that no person of ordinary, sound business judgment would deem it worth that which the corporation paid." *Stein v. Orloff*, Del.Ch., C.A. No. 7276, Hartnett, V.C. (May 30, 1985), at 14 (citing *Saxe v. Brady*, Del.Ch., 184 A.2d 602 (1962)), *appeal denied*, Del.Supr., 504 A.2d 572, Horsey, J. (1986) (order). The facts alleged in the instant complaints, if assumed to be true, would not support any such finding. Therefore, they do not create a reasonable doubt as to the propriety of the transaction's underlying purpose.

■ On the issue of purpose, if all conclusory allegations and pejorative descriptions are disregarded, the pleaded facts indicate as follows: In addition to being a wholly-owned subsidiary, EDS was also one of GM's major corporate suppliers. Perot, who was EDS' chairman and a GM director, had publicly expressed his view that the entire GM system should be "nuked," and demanded that *he* be allowed to run EDS the way *he* saw fit or that GM buy him out. If, for purposes of the instant motions, the complaints are viewed in that light, it becomes difficult to argue that the

business judgment rule should not apply where an independent, disinterested board of directors decides not to abdicate control over a wholly-owned subsidiary and principal supplier, but instead determines to eliminate the source of the policy dispute over how that subsidiary should be managed. However controversial, unpopular, or even wrong such a decision might turn out to be, it is precisely the kind of business judgment that the rule is intended to enable an independent, disinterested board of directors to make. I understand that plaintiffs view this matter quite differently, but for their view to prevail on a Rule 23.1 motion to dismiss, it must be supported by particularized, pleaded facts. In this case those facts do not create a reasonable doubt that the GM Board's sole or primary purpose in approving the transaction was to exact the "no-criticism" covenant from Mr. Perot.

■ Lastly, plaintiffs contend that GM's repurchase of the contingent notes violated the indenture agreement, and that that circumstance deprives the transaction of business judgment protection. Here again, the pleaded facts do not support the premise for that argument. The allegation that the contingent notes are not redeemable until 1989, and that "it was a violation of the governing Indenture for Contingent Notes Due 1991 to 'prepay' the notes," is conclusory. Plaintiffs do not identify any specific provision of the indenture agreement that would prohibit the Board from redeeming the notes before their maturity date.[18]

## V. *Conclusion*

In summary, the plaintiffs have failed to satisfy either prong of *Aronson*, and have therefore not excused their failure to make a demand upon GM's directors.

Before concluding I would venture two observations.

First, nothing in this Opinion is intended to suggest any view, one way or another,

---

**18.** Similarly deficient is the allegation that the buy-back transaction violated the public policy of Delaware and New York. No specific public policy, or its statutory or decisional source, is identified.

on the merits of this admittedly controversial transaction. A perhaps unfortunate byproduct of *Aronson* is that its very application to a specific set of pleaded facts may be misinterpreted as a judicial stamp of approval or disapproval of the transaction itself. In fact, this decision, like any demand-futility adjudication, represents nothing more than a determination that the facts in a given derivative complaint are (or are not) sufficient to excuse the making of a demand.

Second, a determination that demand is not excused does not leave the plaintiffs without redress. Should the plaintiffs make a demand, and should GM's Board of Directors reject it, the plaintiffs may commence a derivative action wherein they may claim that the rejection was wrongful. *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779 (1981). Should the plaintiffs' challenge to any rejection of their demand be successful, their derivative action would then be permitted to go forward.

For the reasons previously stated, the defendants' motion to dismiss the complaints is granted.

IT IS SO ORDERED.