Robert **STROUGO**, on Behalf of
**THE BRAZILIAN EQUITY
FUND, INC.**, Plaintiff,

v.

Emilio **BASSINI**, **Richard Watt**, **Daniel Sigg**, **Dr. Enqieue R. Arzac**, **James J. Cattano**, **Peter A. Gordon**, **George W. Landau**, **Martin M. Torino** and **BEA Associates**, Defendants,

and

**The Brazilial Equity Fund, Inc.,
Nominal Defendant.**

Robert **STROUGO**, on behalf of himself
and all others similarly situated,
Plaintiff,

v.

Emilio **BASSINI**, **Richard Watt**, **Daniel Sigg**, **Dr. Enrique R. Arzac**, **James J. Cattano**, **Peter A. Gordon**, **George W. Landau**, **Martin M. Torino** and **BEA Associates**, Defendants.

No. 97 Civ. 3579(RWS).

United States District Court,
S.D. New York.

April 6, 1998.

---

Wechsler Harwood Halebian & Feffer, New York City, Stuart D. Wechsler, Richard B. Brualdi, of counsel, for Plaintiff.

Willkie Farr & Gallagher, New York City, Lawrence O. Kamin, of counsel, for Defendants BEA Associates, Emilio Bassini, Richard Watt and Daniel Sigg.

Morrison & Foerster, New York City, Jack C. Auspitz, David S. Berg, of counsel, for Defendants Dr. Enrique R. Arzac, James T. Cattano, Peter A. Gordon, George W. Landau and Martin M. Torino.

## OPINION

SWEET, District Judge.

Defendants BEA Associates ("BEA"), the investment adviser to the Brazilian Equity Fund, Inc. (the "Fund") and Emilio Bassini, Richard Watt and Daniel Sigg, at all relevant times directors of the Fund and employees of BEA (together with BEA, the "BEA Defendants") have moved to dismiss the complaint of plaintiff Robert Strougo ("Strougo") pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim and Fed.R.Civ.P. 23.1 for failure to make a pre-litigation demand upon the Fund's board of directors prior to commencing this derivative action; or, in the alternative, to certify a question to the Maryland Court of Appeals pursuant to Maryland Courts and Judicial Proceedings § 12–603. Defendants Enrique R. Arzac, James J. Cattano, Peter A. Gordon, George W. Landau, and Martin M. Torino (the "Outside Director Defendants"), at all relevant times directors of the Fund who are not employees of BEA, have filed a similar motion. For the reasons set forth below, the motions to dismiss will be granted as to the class action claims and denied as to all other claims.

### Prior Proceedings

Strougo filed the complaint in this action on May 16, 1997, repeating similar allegations to those he set forth in an action involving a rights offering against a different fund that invested in Brazilian securities. *See Strougo v. Scudder, Stevens & Clark, Inc.*, 96 Civ. 2136(RWS) (the "Scudder Action").

This action arises from a 1996 rights offering (the "Rights Offering") by the Fund, a closed-end investment company, under which the Fund's existing shareholders were given the opportunity to purchase additional shares of newly issued Fund stock at a discount from market value. Strougo, a shareholder of the Fund, alleges that the Rights Offering constituted a breach of duty by BEA (the Fund adviser) and the Fund's directors because the offering purportedly diluted the shareholders' investments, imposed transaction costs on the Fund (such as investment banking fees), and was allegedly motivated by a desire to increase BEA's investment advisory fee. Strougo does not allege making a demand on the Fund's board of directors prior to initiating this derivative action.

The complaint contains the same six causes of action alleged in the Scudder Action; (1) a claim under the section 36(b) of the Investment Company Act of 1940, as amended (the "ICA"), for excessive fees;[1] (2) a "control person" claim under section 48(a) of the ICA; (3) two derivative claims alleging breach of fiduciary duty under section 36(a) of the ICA and under Maryland law; and (4) two direct class action claims alleging breach of duty under section 36(a) of the ICA and under Maryland law. The futility of demand upon the Board is alleged based upon the interest of the directors.

The instant motion by the Outside Director Defendants was filed on September 15, 1997, and the motion by the BEA Defendants was filed on September 16, 1997. The motions seek (1) dismissal of the derivative claims for failure to make a demand upon the board of directors of the Fund (the "Board"); (2) cer-

---

1. This claim was withdrawn after the making of the instant motions.

tification of the futility question to the Maryland Court of Appeals; and (3) dismissal of the class action claims. The motions were considered fully submitted after argument on December 17, 1997.

### The Facts

On a motion to dismiss under rule 12(b)(6), the facts alleged I the complaint are presumed to be true, and all factual inferences are drawn in the plaintiff's favor. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). Accordingly, the facts p-resented here are primarily from the allegations of the Complaint and do not constitute findings of fact by the Court.

Strougo has alleged that he purchased 1,000 shares of the Fund on January 11, 1993 and has held shares ever since.

The Fund is a non-diversified, publicly traded, closed-end investment company registered under the ICA and incorporated under the laws of Maryland that invests primarily in the securities of Brazilian companies. The Fund's shares are traded on the New York Stock Exchange.

BEA is the investment adviser of the Fund and manages the Fund's operations and investments subject to the governance of an eight member board of directors, made up of Emilio Bassini, Richard Watt and Daniel Sigg who, at all relevant times, were also BEA employees and Dr. Enrique R. Arzac, James J. Cattano, Peter A. Gordon, George W. Landau and Martin M. Torino, who are not employed by BEA but serve on the boards of BEA advised funds as follows:

| Director | Number of BEA Funds | Compensation From All BEA Funds |
|---|---|---|
| Dr. Enrique Arzac | 9 | No figure in complaint |
| James J. Cattano | 6 | $49,000 |
| Peter A. Gordon | 5 | $39,000 |
| George W. Landau | 6 | $49,000 |
| Martin M. Torino | 5 | $42,000 |

The distinctions between an open-end and closed-end investment company, and the different ways in which they can raise additional capital has been described as follows:

> Unlike a traditional mutual fund in which investors purchase and redeem shares directly from and with the mutual fund, a closed-end fund has a fixed number of shares and (after the initial public offering) investors may only purchase shares from an existing shareholder through a stock exchange on which such shares are listed. Thus, shares in a closed-end fund are traded exactly like the shares of any other publicly-owned corporation. By contrast with an "open-end" mutual fund, in which the number of shares is not fixed and investors can purchase or redeem shares at current net asset value ("NAV") (calculated by dividing the fund's total assets by the number of shares outstanding), a closed-end fund has a fixed number of shares that originally were sold in a public offering. Per-share trading prices may be at either a premium or a discount to NAV, but more often are at a discount.

> Because closed-end funds operate with a fixed number of shares, they have limited options for obtaining capital to make new investments. Once a fund's initial capital has been fully invested, new investments generally can be made only if the fund sells existing portfolio holdings. Other options for raising capital include secondary public offerings at net asset value, or rights offerings to current investors at or below NAV.

*Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F.Supp. 783, 788 (S.D.N.Y.1997) (hereinafter *Scudder I*). Here, the Fund determined that it would raise additional capital by means of a non-transferable rights offering to current investors.

After the close of trading on June 6, 1996, the Fund announced that it would issue non-

transferable rights to its shareholders, and that it expected to raise approximately $20 million thereby. The Rights Offering would provide one right per share to each shareholder and the rights were to expire on August 16, 1996. A holder of three rights could subscribe to one new share, at the subscription price, during a subscription period that would begin on July 17 and end on August 16.

The subscription price per share for the Rights Offering was set as follows: "90% of the lower of (I) the average of the last reported sales price of a share of the Fund's Common Stock on the New York Stock Exchange on the Pricing Date and on the four preceding business days thereof and (ii) the net asset value per share as of the close of business on the Pricing Date."

The prospectus for the Rights Offering stated that the Fund's board of directors had determined that the Rights Offering:

> would be in the best interests of the Fund and its shareholders to increase the assets of the Fund available for investment, thereby enabling the Fund to more fully take advantage of available investment opportunities consistent with the Fund's investment objective of long-term capital appreciation. In reaching its decision, the Board of Directors was advised by BEA Associates that the availability of new funds would provide the Fund with additional investment flexibility as well as increase the Fund's ability to take advantage of what BEA Associates believes to be timely opportunities in the Brazilian market as a result of recent economic and political events and stock market developments. In evaluating such investment opportunities, the Board considered, among other things, the impact that Brazil's reform process would have on the country's stock prices, the future prospects for Brazil's growth and the likelihood of future privatizations.
> The Board of Directors also considered that a well-subscribed rights offering may reduce the fund's expense ratio, which may be of a long-term benefit to shareholders. In addition, the Board of Directors considered that such a rights offering could re-

sult in an improvement in the liquidity of the trading market for shares of the Fund's common stock ("Common Stock") on the New York Stock Exchange, where the shares are listed and traded. The Board of Directors also considered the proposed terms of the Offer ... including the expenses of the Offer, and its dilutive effect, including the effect on non-exercising shareholders of the Fund. After careful consideration, the Fund's Board of Directors unanimously voted to approve the Offer.

On the day the Rights Offering was announced the stock had closed at 13–1/2. On June 7, a day later, the stock closed up 1/8 to 13–5/8. On June 24, 1996, just over two weeks after the announcement of the Rights Offering, the shares closed at 14–3/4. Within the month following the announcement, the stock never closed lower than 13–3/8. However, before the announcement of the Rights Offering on May 30, 1996, shares of the Fund were trading at a 7.7% discount to net asset value ("NAV"). At the close of business on June 6, 1996, that discount was 13%. By July 18, 1996, it was 22.7%

### Discussion

#### A. Standard For Motion to Dismiss

In deciding the merits of a motion to dismiss for failure to state a claim, all material allegations composing the factual predicate of the action are taken as true, for the court's task is to "assess the legal feasibility of the complaint, not assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)). Thus, where it is clear that plaintiff can prove no set of facts in support of his or her claim which would warrant relief, the motion to dismiss must be granted. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (on motion under Rule 12(b)(6), Fed. R.Civ.P., affirmation of dismissal of the complaint requires it to be " 'clear that no relief could be granted under any set of facts that could be proved consistent with the allega-

tions'") (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

### B. *Futility of Demand Has Been Established*

Despite the positions taken by the defendants, the issue of demand futility is controlled by the decision in *Scudder I.* It is established that the demand requirement under Fed.R.Civ.P. 23.1 is analyzed under the laws of the state of incorporation of the derivative defendant, in this case Maryland. *See Kamen v. Kemper Fin. Servs.,* 500 U.S. 90, 100–01, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). It is also established that Maryland law excuses demand only when the directors are interested in the transaction or insufficiently capable of exercising independent judgment. *See Grill v. Hoblitzell,* 771 F.Supp. 709, 711 & n. 2 (D.Md.1991) (holding that demand is excused where directors are "dominated and controlled" by the wrongdoer); *see also Eisler v. Eastern States Corp.,* 182 Md. 329, 35 A.2d 118, 119–20 (1943) (setting forth the Maryland demand requirement).

Certain of the grounds alleged in the complaint to excuse demand are legally insufficient to do so. For example, the allegation that the Board "participated or acquiesced in the wrongful acts at issue," has consistently been held to be an insufficient ground for alleged futility. *See, e.g., Pogostin v. Rice,* 480 A.2d 619, 625 (Del.1984); *Aronson v. Lewis,* 473 A.2d 805, 817 (Del. 1984); *Blasband v. Rales,* 971 F.2d 1034, 1048–49 (3d Cir.1992) (Delaware Law); *Mendelovitz v. Vosicky,* 1993 WL 367091, at *2 (N.D.Ill. Sept.16, 1993), *aff'd,* 40 F.3d 182 (7th Cir.1994). Similarly, contentions that the entire board is responsible for the conduct or that there are allegations of securities law violations have also been held insufficient to excuse demand. *See Grobow v. Perot,* 526 A.2d 914, 924–25 (Del.Ch.1987), *aff'd,* 539 A.2d 180 (Del.1988); *Levine v. Prudential Bache Properties, Inc.,* 855 F.Supp. 924, 941 (N.D.Ill.1994) (Delaware law).

In addition, receipt of directors' fees, in and of itself, does not constitute a disqualifying interest or render demand on a board directors to sue other directors futile. For example, the Seventh Circuit, interpreting Maryland law, held that if such allegations were sufficient, "the demand rule would be negated—for almost all directors receive fees." *Kamen v. Kemper Fin. Servs.,* 939 F.2d 458, 460 (7th Cir.1991); *see also Langner v. Brown,* 913 F.Supp. 260, 265 (S.D.N.Y. 1996); *Grobow,* 526 A.2d at 924–25.

The decision in *Scudder I* was the subject of a motion for reargument and certification to the Court of Appeals which were disposed of in *Strougo v. Scudder, Stevens & Clark, Inc.,* No. 96 Civ. 2136, 1997 WL 473566 (S.D.N.Y. August 18, 1997) (hereinafter *Scudder II*).

Both *Scudder I* and *Scudder II* concluded that in addition to receiving compensation from Scudder, the Scudder directors served on multiple funds for which Scudder was the investment adviser and that "well-compensated service on multiple boards of funds managed by a single fund adviser can, in some circumstances, be indistinguishable in all relevant respects from employment by the fund manager, which admittedly renders a director interested." *Scudder II,* 1997 WL 473566, at *5.

The memorandum in support of the BEA Defendants' motion states:

> [A] different result is required here because 1) the combination of modest compensation and multiple directorships in this matter should not raise questions about independence; 2) there is no particular logic to support the conclusion that multiple directorships, rather than merely compensation, is indicative of being "interested"; 3) a number of other cases have rejected the notion that demand on directors can be excused because of their multiple directorships; 4) in the mutual fund industry, there are already statutory safeguards assuring the independence of directors in their dealings with the investment adviser; and 5) the result in *Scudder I* will essentially necessitate a restructuring of governance in the mutual fund industry for no particularly good reason and result in a potential flood of lawsuits

against fund directors in light of their newly-held "dominance" by fund advisers.

As to the first grounds for distinction, it is urged in effect that it is a question of the amount of money derived from the multiple directorships and that the amount is sufficiently less than that involved in the Scudder Action, to eliminate the question of "interest." A distinction is sought to be made between the $54,000 in fees in *Scudder I* and the $39,000 and $49,000 in this instance. In the terms of the old saw, "now we are just talking about money." The principle set forth in *Scudder I* remains intact: the receipt of fees from multiple directors from funds which BEA serve as an adviser constitutes interest.

The remaining positions taken by the defendants were dealt with in *Scudder I* and the rationale there set forth applies here.

Indeed here the issue of interest is more significant since as defined in *Scudder I* there are no disinterested directors to whom an independent inquiry could be directed. Demand futility has been established under the determination reached in the Scudder Action.

### C. *Certification is Not Appropriate*

Under the recently enacted Maryland statute, § 12–603, certification of a question of law to the Court of Appeals is permitted whenever the question may be determinative of an issue in a pending federal case and there is no controlling authority:

> The Court of Appeals of this State may answer a question of law certified to it by a court of the United States or by an appellate court of another State or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision or statute of this State.

As stated in *Scudder II,* no controlling appellate decision exists on this issue. *See Scudder II,* 1997 WL 473566, at *5.

■ The most authoritative guidance on when such certification should be sought comes from the Honorable Jose A. Cabranes sitting in the District Court before his eleva-

tion to the Court of Appeals, in *L. Cohen & Co., Inc. v. Dun & Bradstreet, Inc.,* 629 F.Supp. 1419 (D.Conn.1986). Given a similar request under a similar provision in Connecticut law, Judge Cabranes reviewed the law of abstention and the authorities relating to certification and concluded that the certification issue would be best left to " 'the sound discretion' of the individual federal judge." *Id.* at 1421–23 (quoting Justice Rehnquist in *Lehman Bros. v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974)). Certification may be appropriate to avoid the premature decision of federal constitutional claims or the unnecessary disruption of state governmental functions, *Id.* at 1423. The factors to be considered include: (1) the extent to which the issue is unsettled (here it has not been considered); (2) the availability of resources (diligent counsel have given the court all there is); (3) the familiarity of the judge with the state law at issue (this factor weighs on the scale towards certification); (4) the age and urgency to the litigation and the cost and delay of certification (this factor would appear to be in equipoise); (5) the frequency of the issue in the future (only Strougo seems to have grasped this particular nettle); and (6) docket demands. *Id.* at 1423–24. As concluded by Judge Cabranes, concerns of restraint, discretion and distinction should be paramount.

■ This is not an exceptional case requiring certification but rather a routine action which raises an unsettled issue of state law requiring the federal court "to exercise our best judgment and conscientiously to perform our duty," *Cohens v. Virginia,* 19 U.S. (6 Wheat) 264, 403, 5 L.Ed. 257 (1821) (Marshall, C.J.). Accordingly, the motions for certification are denied.

### D. *The Class Action Claims Are Dismissed*

■ As in the Scudder Action, the claims allege harm which applied to the shareholders as a whole. The injury alleged is dilution resulting from the Rights Offering and its transaction costs and the breach of fiduciary duty arising out of the motivation to increase fees of BEA.

Strougo has asserted that the Rights Offering disproportionately affected those shareholders who chose not to exercise their rights or that the Rights Offering here is distinguishable because the rights were not transferable. However, "[s]o long as the defendants' action toward all shareholders was the same, and any disproportionate effect was the result of the various shareholders' responses to the action, the shareholders have no direct action." *Scudder I*, 964 F.Supp. at 792 (citing *In re Nuveen Fund Litig.*, 855 F.Supp. 950, 955 (N.D.Ill.1994)).

The non-transferability of the rights does not alter the applicability of the Rights Offering to all shareholders, thus requiring the dismissal of the class action claims.

### E. The Motions To Dismiss Fiduciary Duty Claims Are Denied

■ The issue of the adequacy of the fiduciary duty claims was presented in similar circumstances in *Scudder I*. There the Court stated:

> Here, as discussed above, all of the *Scudder* defendants are interested in the Rights Offering and three of the four purportedly "independent" directors are alleged to be *Scudder's* "house" directors, receiving substantial compensation for service given to other Scudder managed funds. This close and financially rewarding relationship with Scudder is sufficient to call into question the independence and disinterestedness of these directors with respect to a Rights Offering that would admittedly benefit Scudder, and dilute non-participating shareholders' interests.
>
> Accordingly, the motion to dismiss the Maryland breach of fiduciary duty claims will be denied.

*Scudder I*, 964 F.Supp. at 801–02.

Here, Strougo alleges that all of the directors are either BEA employees, or BEA "house" directors, receiving substantial compensation for service given to other BEA managed funds.

Similarly, the defendants here contend that because rights offerings are allowed by the Securities and Exchange Commission ("SEC"), their conduct in authorizing and implementing the Fund's rights offering cannot constitute a breach of fiduciary duty. In so doing, defendants blend and confuse two distinct issues. The first is whether the SEC has prohibited rights offerings in all instances—clearly the answer is no. *Scudder I* determined that an allegation that a rights offering can be implemented for reasons not in the best interest of the Fund and its shareholders, and thus may constitute a breach of fiduciary duty setting forth a viable cause of action. *Id.* at 798–802.

### F. The Motions to Dismiss the Claim for Control Person Liability Are Denied

■ The Control Person claim was presented and its adequacy determined in *Scudder I*, 964 F.Supp. at 806. No meaningful distinction can be drawn between the issue presented here. As set forth in *Scudder I*:

> [T]he 'control person' provision of the Securities Exchange Act 'is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction.' Such indirect means of discipline or influence may include 'business relationships [other than stock ownership], interlocking directors, family, relationships and a myriad of other factors'.
>
> \* \* \* \* \* \*
>
> The allegation that, through their control of the substantial payments made for service on the boards of multiple *Scudder* funds, the *Scudder* defendants had the means to indirectly discipline or influence [the outside directors] is sufficient to survive a motion to dismiss.

964 F.Supp. at 806 (citations omitted). Therefore, the motions to dismiss this claim is denied.

### Conclusion

For the reasons set forth above, the motions to dismiss will be granted as to the class action claims and denied as to all other claims. Discovery will be completed in 120

days and the pretrial order filed 20 days thereafter.