Robert STROUGO, on behalf
of the Brazilian Equity
Fund, Plaintiff,

v.

Emilio BASSINI, Richard Watt, Daniel Sigg, Dr. Enrique R. Arzac, James J. Cattano, Peter A. Gordon, George W. Landau, Martin M. Torino and BEA Associates, Defendants

and

The Brazilian Equity Fund, Inc.
Nominal Defendant

No. 99 CIV. 3579(RWS).

United States District Court,
S.D. New York.

Sept. 8, 2000.

Wechsler, Harwood, Halebian & Feffer LLP, for Plaintiff, New York, NY, Joel C. Feffer, Jeffrey M. Haber, Of Counsel.

Willkie Farr & Gallagher, for Defendants BEA Associates, Emilio Bassini, Richard Watt and Daniel Sigg, New York, NY, Lawrence O. Kamin, Of Counsel.

Morrison & Forster LLP, for Defendants Dr. Enrique R. Arzac, James J.

Cattano Peter A. Gordon, George W. Landau and Martin M. Torino, New York, NY Jack C. Auspitz, Of Counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, for Nominal Defendant The Brazilian Equity Fund, New York, NY, Martin London, Richard A. Rosen, Tracy Anbinder Baron, Of Counsel.

## OPINION

SWEET, District Judge.

Nominal defendant The Brazilian Equity Fund, Inc. (the "Fund"), defendants BEA Associates ("BEA"), Emilio Bassini ("Bassini"), Richard Watt ("Watt"), Daniel Sigg ("Sigg") (collectively, the "BEA Defendants"), and defendants Dr. Enrique R. Arzac ("Arzac"), James J. Cattano ("Cattano"), Peter A. Gordon ("Gordon"), George W. Landau ("Landau") and Martin M. Torino ("Torino") (collectively, the "Outside Directors," and together with the Fund, BEA and the BEA Defendants, the "Defendants") have moved to dismiss the shareholder derivative complaint of plaintiff Robert Strougo ("Strougo") under Rule 12(b)(6), Fed.R.Civ.P., or, in the alternative, for summary judgment pursuant to Rule 56, Fed.R.Civ.P., based upon the determination of a Special Litigation Committee of the Fund's Board of Directors (the "SLC") that the continued prosecution of this action is not in the best interests of the Fund or its shareholders.

For the reasons set forth below, the motion is granted.

### Prior Proceedings

The parties, prior proceedings and factual background of this action are set forth in the prior opinions of this Court, familiarity with which is assumed. *See Strougo v. Bassini,* 1999 WL 249719 (S.D.N.Y. Apr 28, 1999); *Strougo v. Bassini,* 1 F.Supp.2d

268 (S.D.N.Y.1998). Prior proceedings and facts relevant to this motion are set forth below.

Strougo filed the complaint in this action on May 16, 1997. The action arises from a 1996 rights offering (the "Rights Offering") by the Fund, a closed-end investment company, under which the Fund's existing shareholders were given the opportunity to purchase additional shares of newly issued Fund stock at a discount from market value. Strougo, a shareholder of the Fund, alleges that the Rights Offering constituted a breach of duty by BEA (the Fund adviser) and the Fund's directors because the offering purportedly diluted the shareholders' investments, imposed transaction costs on the Fund (such as investment banking fees), and was allegedly motivated by a desire to increase BEA's investment advisory fee rather than to benefit shareholders. Strougo does not allege making a demand on the Fund's Board of Directors ("Board") prior to initiating this derivative action.

The Outside Directors filed a motion to dismiss on September 15, 1997. The BEA Defendants filed a motion to dismiss on September 16, 1997. By Order and Opinion dated April 6, 1998, the Court held that demand futility had been established. The Court granted the motions to dismiss the class action claims, but denied the motions to dismiss the derivative claims and the control person claim. *Strougo v. Bassini,* 1 F.Supp.2d 268.[1]

The claims remaining in the complaint are (1) breach of fiduciary duty against all defendants under ICA § 36(a) and under Maryland common law, and (2) control person liability under ICA § 48(a) against the BEA defendants.

---

1. The original complaint contained six causes of action: (1) a claim under § 36(b) the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a–47(a) (the "ICA"), for excessive fees; (2) a "control person" claim under § 48 of the ICA; (3) a direct class action claim alleging breach of fiduciary duty under

§ 36(a) of the ICA; (4) a direct class action claim alleging breach of fiduciary duty under Maryland common law; (5) a derivative claim alleging breach of fiduciary duty under § 36(a) of the ICA; and (6) a derivative claim alleging breach of fiduciary duty under Maryland common law.

With respect to the breach of fiduciary duty claims, Strougo alleges that the Defendants breached their duty of loyalty by failing to put the interests of the Fund and the shareholders first, and breached their duty of due care by failing to consider adequately the negative effect that the Rights Offering would have on the Fund.

With respect to the control person claim, Strougo alleges that BEA caused all of the directors to violate the ICA and that Bassini, Sigg, and Watt caused the Outside Directors to violate the ICA.[2]

The instant motion was filed on December 30, 1998. This Court adjourned the motion pending further discovery by Strougo. *Strougo v. Bassini,* 1999 WL 249719 (S.D.N.Y. Apr. 28, 1999). Strougo filed a memorandum on April 7, 2000 in opposition of the Fund's motion to terminate the action. The Fund filed a reply memorandum on May 12, 2000 and the motion was considered fully submitted after oral argument on June 8, 2000.

*Facts*

### A. The Rights Offering

The Fund is a non-diversified, publicly traded, closed-end investment company registered under the ICA and incorporated under the laws of Maryland that invests primarily in the securities of Brazilian companies. The Fund's shares are traded on the New York Stock Exchange.

BEA is the investment adviser of the Fund and manages the Fund's operations and investments subject to the governance of an eight-member board of directors, made up of Bassini, Watt and Sigg who, at all relevant times, were also BEA employees, and Arzac, Cattano, Gordon, Landau and Torino, who are not employed by BEA but serve on the boards of BEA-advised funds.

In June of 1996, the Board decided to conduct the Rights Offering in the hopes of raising approximately $20 million in additional capital. The Rights Offering would provide one right per share to each shareholder and the rights were to expire on August 16, 1996. A holder of three rights could subscribe to one new share, at the subscription price, during a subscription period that would begin on July 17 and end on August 16.

The subscription price per share for the Rights Offering was set as follows: "90% of the lower of (i) the average of the last reported sales price of a share of the Fund's Common Stock on the New York Stock Exchange on the Pricing Date and on the four preceding business days thereof and (ii) the net asset value per share as of the close of business on the Pricing Date."

The prospectus for the Rights Offering stated that the Board had determined that the Rights Offering:

> would be in the best interests of the Fund and its shareholders to increase the assets of the Fund available for investment, thereby enabling the Fund to more fully take advantage of available investment opportunities consistent with the Fund's investment objective of long-term capital appreciation. In reaching its decision, the Board of Directors was advised by BEA Associates that the availability of new capital would provide the Fund with additional investment flexibility as well as increase the Fund's ability to take advantage of what BEA Associates believes to be timely opportunities in the Brazilian market as a result of recent economic and political events and stock market developments. In evaluating such investment opportunities, the Board of Directors considered, among other things, the impact that Brazil's reform process would have on the country's stock prices, the future

---

**2.** In 1996, Strougo brought a similar suit containing the same six causes of action, concerning a rights offering conducted by a different closed-end fund that invests in the securities of Brazil, the Brazil Fund, managed by Scudder, Stevens & Clark. *See Strougo v. Padegs,* 27 F.Supp.2d 442 (S.D.N.Y.1998).

prospects for Brazil's growth and the likelihood of future privatizations.

The Board of Directors also considered that a well-subscribed rights offering could reduce the Fund's expense ratio, which might be of a long-term benefit to shareholders. In addition, the Board of Directors considered that such a rights offering could result in an improvement in the liquidity of the trading market for shares of the Fund's common stock ("Common Stock") on the New York Stock Exchange, where the shares are listed and traded. The Board of Directors also considered the proposed terms of the Offer including the expenses of the Offer and its dilutive effect, including the effect on non-exercising shareholders of the Fund. After careful consideration, the Board of Directors unanimously voted to approve the Offer.

On the day the Rights Offering was announced, the stock had closed at 13½. On June 7, a day later, the stock closed up ⅛ to 13⅝. On June 24, 1996, just over two weeks after the announcement of the Rights Offering, the shares closed at 14¾. Within the month following the announcement, the stock never closed lower than 13. However, before the announcement of the Rights Offering on May 30, 1996, shares of the Fund had been trading at a 7.7% discount to net asset value ("NAV"). At the close of business on June 6, 1996, that discount was 13%. By July 18, 1996, it was 22.7%.

### B. *The SLC*

On May 22, 1998, the Board, by consent resolution, created the SLC to consider the allegations raised in the present action and to review the facts underlying those allegations. The SLC was given "all of the powers and authority of the Board of Directors" to, among other things, investigate all matters alleged in or relating to this action, retain legal counsel or other

advisers as it deems appropriate to assist its investigation, appear, through its separate counsel, on behalf of the Fund in this action, and direct the representation of the Fund's interests in this action. (Barron Aff. Ex. 1 at 2–3).

The consent resolution adopted by the Board on May 22, 1998 to create the SLC also appointed Robert J. McGuire to the Board of Directors and as a member of the SLC. After the resignation of the second original SLC member in late July 1998, the Board appointed Miklos A. Vasarhelyi as a director and as a member of the SLC on August 11, 1998.

From June through November 1998, the SLC conducted an investigation of the Rights Offering and the allegations raised in this action. This process involved the collection of documents and the interviewing of witnesses from BEA, the Board, and Bear Stearns, the investment banking firm that served as dealer-manager for the Rights Offering. Strougo and his counsel did not participate in the SLC's investigation, although they were invited to do so.

Counsel for the SLC reviewed approximately 36,000 pages of documentary evidence and other information (including data compilations) from the BEA Defendants, the Outside Directors and Bear Stearns. Members of the SLC personally reviewed all of the documents that "counsel believed were particularly pertinent," in addition to the documents used in the witness interviews and any other documents that the SLC members specifically requested to review.

The SLC and its counsel interviewed a total of eleven witnesses. These included Bassini, Sigg and Watt, Michael Pignataro, a non-defendant employee of BEA who was the Fund's Chief Financial Officer, Arzac, Landau, Cattano, Torino, and three witnesses from Bear Stearns. Counsel conducted follow-up telephone interviews of Bassini and Pignataro.[3]

---

**3.** The SLC did not interview Gordon, the fifth outside director defendant, because Gordon

suffered a stroke prior to the events surrounding the Rights Offering and did not partici-

Both members of the SLC participated either in person or by telephone in seven of the witness interviews. In three of the witness interviews, one of the members of the SLC participated. In one witness interview and in the follow-up telephone interviews of Bassini and Pignataro, neither SLC member was able to participate. After every interview, the SLC's counsel drafted an in-depth summary, which was reviewed and approved by the members of the SLC.

The first formal meeting of the SLC with its counsel was held on July 8, 1998. During the SLC's investigation, two additional formal meetings were held, one on August 12, 1998 and another on September 14, 1998. In addition, seven more informal meetings were held to discuss the progress of the SLC's investigation, the witness interviews, and the collection and review of documents.

On December 15, 1998, the SLC held its final formal meeting with counsel. The SLC members determined that their investigation was complete, that there was no evidence supporting plaintiff's allegations, and that dismissal of the action would best serve the interests of the Fund and its shareholders.

The SLC found no evidence that the Defendants breached their duty of loyalty. The SLC concluded that BEA and the Board of Directors waited patiently until the time when they thought market conditions were optimal and selected the fundraising method that was predicted to maximize the benefits to all shareholders. The SLC found that each decision made by the Defendants was made in an effort to help the Fund and its shareholders take advantage of the investment opportunities in Brazil while minimizing any negative effects that the Rights Offering might cause.

The SLC found no evidence that the Defendants breached their duty of care, finding instead that the Defendants exhaustively considered any potential nega-

pate in the decision to conduct the Rights

tive effects. The Report of the SLC (the "Report") states that the Defendants sought the opinions of two respected investment banking firms, analyzed the data prepared by those firms to determine which approach would work best, required Bear Stearns to revise and supplement its materials so that other options could be considered, and discussed the advantages and disadvantages of each decision at great length.

Finally, the SLC found that even if there were evidence supporting the substantive allegations in the complaint, the damages to be recovered would be negligible at best. According to the Report, although the Fund's per-share NAV and the market price of its shares declined in the short term, those deadlines were not permanent. The Report notes that by November 21, 1996, about three months after the Rights Offering had been completed, the per-share NAV had returned to its pre-offering level. By January 5, 1997, the stock price had rebounded to its pre-offering level as well. The SLC found that one year after the Rights Offering, a shareholder who did not participate in the Rights Offering owned the same shares as before, but at a higher market price and a higher NAV. A shareholder who did participate in the Rights Offering had the added benefit of purchasing additional shares of the Fund at a significant discount to the market price.

### Discussion

#### I. The Fund's Motion to Terminate is Granted

Strougo's remaining claims are (1) breach of fiduciary duty against all defendants under ICA § 36(a) and under Maryland common law, and (2) control person liability under ICA § 48(a) against the BEA defendants.

With respect to the breach of fiduciary duty claims, Strougo alleges that defendants breached their duty of loyalty "by

Offering.

failing to put the interests of the Fund and its shareholders first," and breached their duty of due care by "failing to adequately consider the negative effect the Rights Offering would have on the Fund." Complaint ¶¶ 108, 112, 113.

With respect to the control person claim, Strougo alleges that the BEA Defendants used their positions of influence to cause both outside and inside directors to violate the ICA by instituting the Rights Offering. Complaint ¶¶ 95–99.[4]

### A. *Standard of Review*

 A special litigation committee has the power to terminate a derivative action to the extent allowed by the state of incorporation. *See Burks v. Lasker,* 441 U.S. 471, 486, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). The Fund is incorporated in Maryland, and under Maryland law, a committee of disinterested and independent directors of a corporation may move to terminate a pending shareholder derivative action which the committee determines in good faith to be contrary to the corporation's best interests. *See, e.g., Rosengarten v. Buckley,* 613 F.Supp. 1493, 1499 (D.Md.1985); *Grossman v. Johnson,* 89 F.R.D. 656, 663 (D.Mass.1981) *aff'd,* 674 F.2d 115 (1st Cir.1982).

 For the reasons set forth by this Court in a related action, *Strougo v. Padegs,* 1 F.Supp.2d 276, 280–82 (S.D.N.Y. 1998), the standard articulated in *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del. 1981) (hereinafter *"Zapata"*) will apply in this case. In *Zapata,* the Supreme Court of Delaware articulated a two-step standard of review applicable to motions to terminate derivative actions based on the recommendation of a special litigation committee:

First, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions... The corporation should have the burden of proving independence, good faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness.

430 A.2d at 788. Once the reviewing court is satisfied that the committee has met its burden of proving good faith and reasonableness, the court, in its discretion, may proceed to the second step. That step requires the court to "determine, applying its own business judgment, whether the motion should be granted." *Id.* at 788–89. *See also Abramowitz v. Posner,* 672 F.2d 1025, 1033 (2d Cir.1982); *Joy v. North,* 692 F.2d 880, 892 (2d Cir.1982) (applying Connecticut law), *cert. denied, Baldwin v. Joy,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). The "function of the court's review is to determine the balance of probabilities as to likely future benefit to the corporation, not to render a decision on the merits, fashion the appropriate legal principles or resolve issues of credibility. Where the legal rule is unclear and the likely evidence in conflict, the court need only weigh the uncertainties, not resolve them. The court's function is thus not unlike a lawyer's determining what the case is 'worth' for purposes of settlement." *Id.*

Under the language of *Zapata,* a motion to terminate a derivative suit is neither a motion to dismiss under Rule 12(b), nor is it a motion for summary judgment pursuant to Rule 56, because it is addressed neither to the adequacy of the cause of action alleged in the complaint nor to the merits of the issues joined by the pleadings. Rather, the motion is a "hybrid" one, derived by analogy to a motion to dismiss a derivative suit based upon a voluntary settlement reached between the parties and to a motion brought pursuant to Rule 41(a)(2), whereby a plaintiff unilaterally seeks a voluntary dismissal of the complaint subsequent to the filing of an

---

4. Under ICA § 48(a), control person claims are predicated upon liability under other applicable sections of the ICA. *See* ICA § 48(a). Accordingly, Strougo's § 48(a) claim is dependent upon the validity of his ICA § 36(a) claim.

answer by the defendant. As such it is addressed necessarily to the reasonableness of dismissing the complaint prior to trial without any concession of liability on the part of the defendants and without adjudicating the merits of the cause of action itself. *Zapata*, 430 A.2d at 787–88; *Kaplan v. Wyatt*, 484 A.2d 501, 506–07 (Del.Ch.1984) *aff'd* 499 A.2d 1184 (Del. 1985).

Although the motion is not strictly one for summary judgment, the corporation moving for termination bears the burden of proving the independence, good faith, and reasonableness of the SLC's review by evidence sufficient to eliminate any genuine questions of fact with regard to these issues. *Zapata*, 430 A.2d at 788–89.

Therefore, Defendants have the burden to establish that the SLC was independent, that the investigation was conducted in good faith and that the SLC had a reasonable basis for its conclusion. In addition, the Report must satisfy the business judgment of the Court.

### 1. *The SLC Acted Independently*

"Whether or not a special litigation committee's decision to terminate a derivative litigation is independent or not depends on the totality of the circumstances." *In re Oracle Sec. Litig.*, 852 F.Supp. 1437, 1441 (N.D.Cal.1994) (applying Delaware law). The "totality of the circumstances" test does not "necessitate the complete absence of any facts which might point to non-objectivity." *Id.* at 1442. A director is independent when he is "in a position to base [his] decision on the merits of the issue rather than ... extraneous considerations or influences." *Johnson v. Hui*, 811 F.Supp. 479, 486 (N.D.Cal.1991).

Strougo asserts that the SLC has not met its burden of establishing independence. As an initial matter, Strougo contends that special litigation committees are inherently biased, particularly when appointed by interested directors. He notes that several courts and commentators have taken notice of the potential for structural bias in special litigation committees. *See, e.g., Panter v. Marshall Field & Co.*, 646 F.2d 271, 300 (7th Cir.1981); *Hasan v. Clevetrust Realty Investors*, 729 F.2d 372, 377 (6th Cir.1984); Coffee & Schwartz, *The Survival of the Derivative Suit: An Evaluation and a Proposal for Legislative Reform*, 81 Colum. L.Rev. 261, 283 (1981) ("[A] derivative action evokes a response of group loyalty, so that even a 'maverick' director may feel compelled to ... protect his fellows from attack."). Strougo asserts that this case proves the proposition that appointing a special litigation committee is " 'always a waste of time and a whitewash.' " Plaintiff's Memorandum at 1, quoting Jerry Knight, *Hospitality Falls by the Wayside in a Marriot Battle*, Wash. Post, Dec. 13, 1999, at F7.

Structural bias in special litigation committees has been widely discussed and analyzed, and courts have "almost universally determined that the standards of review developed for derivative suits are designed to overcome the effects, if any, of structural bias." *Weiland v. Illinois Power Company*, 1990 WL 267364 at *15 (C.D.Ill. September 17, 1990); *Zapata*, 430 A.2d at 786–87; *Auerbach v. Bennett*, 47 N.Y.2d 619, 393 N.E.2d 994, 1001, 419 N.Y.S.2d 920, 927–28 (1979); *Lewis v. Graves*, 701 F.2d 245 (2d Cir.1983). Indeed, only a minority of courts have found that structural bias taints the independence of litigation committee members. *Peller v. The Southern Company*, 707 F.Supp. 525, 527 (N.D.Ga.1988) (citing cases), *aff'd* 911 F.2d 1532 (11th Cir.1990). The majority view recognizes that independent directors are capable of rendering an unbiased opinion despite being appointed by defendant directors and sharing a common experience with the defendants. *Id.* at 527–28 (citing cases). As the court noted in *Peller*, if independent litigation committees are to be utilized, courts must accept the likelihood that the members of those committees will have experiences similar to that of the defendant directors. *Id.* Thus, structural bias should not destroy the in-

dependence of an independent litigation committee, but instead should be considered in reviewing the actions and decisions of the special litigation committee.

Adopting Strougo's reasoning would lead to the rejection of special litigation committees in their entirety. *See Miller v. Register and Tribune Syndicate, Inc.,* 336 N.W.2d 709, 716 (Iowa 1983) (rejecting the use of a special litigation committee). While mindful of the admonitions of the Honorable Ralph K. Winter in *Joy,* that "if the ... directors expected any result other than a recommendation of termination ... they would probably never establish a committee," 692 F.2d at 888, the Court rejects the blanket condemnation of special litigation committees in favor of tangible evidence demonstrating a lack of independence.

### a. *Robert J. McGuire*

Robert J. McGuire ("McGuire") was appointed both as a director and to the SLC on May 22, 1998, the same day the Board adopted the consent resolution that established the SLC. At the time of his appointment, McGuire was counsel to the law firm Morvillo, Abramowitz, Grand, Iason & Silberberg. He served as an Assistant United States Attorney in the Southern District of New York from 1962 to 1977 and thereafter was appointed the New York City Police Commissioner, where he served from January 1978 to December 1983. In addition to former positions as president, chairman and CEO of major security firms, McGuire has served on numerous boards and commissions at federal, state and municipal levels, in both the private and public sectors. For five years McGuire served as outside director representing bondholder interests to the Taj Majal Casino, Inc., where he was also a member of the Audit Committee. Report at 7–8.

The timing and circumstances of Mr. McGuire's tenure as an SLC member reflect that he acted independently of the Board. McGuire was elected to the Board and SLC more than one year after the complaint was filed in this case, nearly two years after the Rights Offering took place. He took no part in conceiving or conducting the Rights Offering and is not a named defendant in this case. Significantly, McGuire is not a board member of any other BEA-managed funds and has no other ties to BEA. Furthermore, as a member of the Board of Directors, McGuire recused himself from portions of meetings in which the cost of this litigation was discussed. McGuire Dep. at 43.

McGuire has only a single prior connection with any Board member. He is acquainted with outside director Ambassador George Landau due to the fact that both men served on the boards of directors of GAM Funds, Inc. and the Emigrant Savings Bank. McGuire had no social contact with Ambassador Landau outside of their board appointments. McGuire Dep. at 32. Accordingly, the Court finds that this is not a sufficient basis on which to question McGuire's independence.

### b. *Miklos A. Vasarhelyi*

On August 11, 1998, the Board appointed Miklos A. Vasarhelyi ("Vasarhelyi") as a director and as a member of the SLC.[5] Vasarhelyi is the William Von Minden Professor of Accounting at the Rutgers University Graduate School of Management and is the Director of the Rutgers Center for Accounting Research. After receiving a bachelor's degree in electrical engineering from the Catholic University of Rio de Janeiro, Vasarhelyi received a M.S. degree in Management from the Alfred P. Sloan School of Management at the Massachu-

---

**5.** Vasarhelyi was appointed to replace the other original SLC member, Richard J. Herring, after Herring resigned on July 31, 1998 due to the potential for conflict of interest with his upcoming service on an advisory board at the Wharton School in the fall of 1998. Final Report at 7 n.2. The SLC and its counsel focused exclusively on document gathering and conducted no interviews until Vasarhelyi was appointed. *Id.* Thus, Herring's independence need not be addressed.

setts Institute of Technology and a Ph.D. in Accounting Information Systems from the Graduate School of Management at the University of California, Los Angeles. Report at 9.

Vasarhelyi has held teaching positions at universities in both the United States and Brazil, and has consulted for both private and public sector entities in both countries. He has published "extensively" on information systems, accounting, and the Internet. *Id.*

Like McGuire, Vasarhelyi was appointed to the Board and SLC more than one year after the complaint was filed in this case, and almost two years after the Rights Offering was completed. Vasarhelyi neither took part in any aspect of the Rights Offering nor is named as a defendant in this case. He has no connection to BEA other than his position on the SLC. Furthermore, as a member of the Board of Directors, Vasarhelyi also recused himself from portions of meetings in which the cost of this litigation was discussed. McGuire Dep. at 43.

Vasarhelyi's only connection to the defendant directors in this case is outside director Dr. Enrique Arzac, whom Vasarhelyi met through their appointments at Columbia University. In itself, such an acquaintance doe not provide cause to question Vasarhelyi's independence as a member of the SLC.

Strougo offers Vasarhelyi's attendance record at SLC meetings as evidence that Vasarhelyi was not independent. Vasarhelyi personally attended 2 of the 13 witness interviews and 3 of the 10 SLC meetings that took place during his tenure. *See* Report Exs. 14, 17, 28, 29, 33. However, Vasarhelyi in fact participated in the majority of witness interviews and in 9 of 10 SLC meeting scheduled during his tenure. In addition to the inperson figures cited by Strougo, Vasarhelyi participated by telephone in an additional 6 witness interviews and 6 SLC meetings. *See* Report Exs. 15, 18, 19, 21, 23, 26, 30, 31, 32, 34, 36, 37. More importantly, though, that Vasarhelyi

had scheduling conflicts has no bearing on whether or not he carried out his duties as an SLC member independently of the Board of Directors. A special litigation committee member's independence depends on whether or not he is influenced by a relationship with an interested director. Vasarhelyi's attendance record at SLC events does not speak to this question.

As for the SLC members' prior acquaintance with individual directors, such associations and contacts arise in any business setting and are neither inappropriate nor do they suggest that McGuire and Vasarhelyi would not faithfully discharge their obligations to the Fund's shareholders. In fact, other cases have found a committee member to be independent even though these relationships were more extensive. In *Kaplan v. Wyatt*, 484 A.2d 501, a committee member who was a major shareholder and a director of companies which had business relationships with the corporation totaling many millions of dollars was found to be independent. In *Genzer v. Cunningham*, 498 F.Supp. 682 (E.D.Mich. 1980), one of the committee members was a paid consultant to the company and found to be independent. *See also In Re General Tire & Rubber Co. Sec. Litigation*, 726 F.2d 1075, 1084 (6th Cir.1984) (stating that "[w]e cannot fashion a flat rule which allows only those individuals with absolutely no contact with the Company to exercise independent business judgment. Such a rule would preclude virtually every outside director from involvement in the business judgment by virtue of having been nominated or selected by the corporation").

In light of the timing of the SLC appointments and the lack of relationship with or influence by interested directors, the Fund has established that both McGuire and Vasarhelyi acted independently.

**2. *The SLC Conducted A Good–Faith Investigation***

█ Next, Strougo contends that the SLC's recommendation to terminate suit

on his claims was not made in good faith. The *Court's focus* in this area is intertwined with its analysis of whether the SLC conducted a reasonable investigation. *See Stein v. Bailey,* 531 F.Supp. 684, 695 (S.D.N.Y.1982) ("Proof ... that the investigation has been so restricted in scope, so shallow in execution, or so pro forma or halfhearted as to constitute a pretext or sham ... would raise questions of good faith ....") (citations and internal quotations omitted).

Strougo points to the timing and methodology of the investigation as evidence supporting its claim. First, Strougo asserts that the SLC reached its conclusions "precipitously," after less than two months of investigation and before "most" of the witness interviews had been conducted. Document gathering began soon after the SLC was established on May 28, 1998. The SLC made numerous additional requests for documents after receiving and reviewing the initial documents provided. Report at 11. It is undisputed that SLC members gathered over 36,000 pages of documents between June and December of 1998. Members of the SLC personally reviewed all of the documents that "counsel believed were particularly pertinent," in addition to the documents used in the witness interviews and any other documents that the SLC members specifically requested to review.

The SLC conducted witness interviews of eleven persons, named above. These interviews began on September 28, 1998 and were completed by October 29, 1998, excluding two follow-up interviews conducted by SLC counsel. Report Exs. 24, 20. A draft report was prepared on November 6, 1998, and the Final Report was filed on December 24, 1998.

The five-month period between the time document gathering began in June and early November, when the draft report was filed, is not an unreasonable period for investigation. *See, e.g., Strougo ex rel. Brazil Fund, Inc. v. Padegs,* 27 F.Supp.2d at 446 (finding reasonable a SLC investigation over four months in length). Moreover, contrary to Strougo's contention that the SLC had made its conclusions before the majority of interviews had been conducted, the draft report was filed approximately one week after the SLC conducted its final witness interview. That SLC counsel conducted two follow-up interviews and continued to gather documents after filing the draft report tends to show diligence in the compilation of the final report rather than bad faith.

Second, Strougo claims that the SLC's investigative method was insufficient in essentially two respects: the SLC (1) interviewed only "friendly" witnesses, and (2) failed to address several important questions, including (a) the lack of shareholder demand for Fund shares, and (b) why dilution increased despite creating a nontransferable Rights Offering.

As stated above, the SLC interviewed all three BEA Defendants, a non-defendant BEA employee who served as the Fund's Chief Financial Officer, four of the five outside directors, and three witnesses from Bear Stearns, the investment banking firm the Fund retained for the Rights Offering. The SLC also re-interviewed certain witnesses. These persons represented an appropriate range of perspectives on the SLC's mission: to investigate the circumstances of the initiation of the Rights Offering and to determine whether both the Fund's decision to conduct the Rights Offering and the subsequent litigation were in shareholders' best interests. Furthermore, the SLC did invite potentially "unfriendly" witnesses such as Strougo and his counsel to be interviewed on two occasions, but Strougo refused. Report at 10–11, Ex. 35.

Strougo argues that if the SLC were conducting its investigation in good faith, it would also have interviewed Smith Barney personnel, whom BEA considered but rejected as dealer managers for the Rights Offering. However, it was not necessary to interview Smith Barney personnel once

the SLC reviewed the substantial documentation Smith Barney originally provided to the Board regarding the proposed Rights Offering. *See* Report Ex. 76. These documents reflected that Smith Barney agreed with the proposition that it was a good time to invest in Brazil and that a rights offering was the best way to raise capital for the Fund. Report Ex. 76. As Vasarhelyi stated in his deposition, "[t]he issue for the SLC was the reasonableness, prudence of the directors in considering and authorizing this rights offering. It was [the SLC's] judgment that they had . . . made an informed decision as to the approach they wished to take, and . . . [the SLC] considered that under the circumstances they were reasonable." Vasarhelyi Dep. at 104.

Next, Strougo claims that the SLC failed to address crucial questions regarding the Board's choices in structuring the Rights Offering. First, Strougo argues that the SLC did not adequately address whether it was reasonable for the Fund's directors to assume that there would be an adequate demand for stock issued upon exercise of the rights. However, the demand issue was addressed at length during the SLC investigation. Pignataro, the Fund's Chief Financial Officer, was questioned on this issue during his first interview and then again in a follow-up interview. He confirmed in detail that the Board had investigated .whether there would be adequate demand for Rights Offering shares and concluded based on the opinion of Bear Stearns, other investment banks interested in acting as ̇dealer-managers, and market analysts that there would be strong demand. Report Exs. 21, 22. Both McGuire and Vasarhelyi confirmed in their depositions that the SLC considered this question and found that "it was reasonable under the circumstances for the Board to consider that there was sufficient demand." McGuire Dep. at 48–51; Vasarhelyi Dep. at 82–83.

Third, Strougo criticizes the SLC for allegedly not asking why dilution increased at higher rates than originally predicted. The witness interview summaries reflect that at least three witnesses were questioned on this topic, and that minimizing dilution was a major factor in structuring the Rights Offering at a one-for-three ratio. *See* Report at 53–55. Once the Rights Offering subscription period began, rising dilution levels were "a major area of concern" to the Pricing Committee and to Bear Stearns. Report Ex. 19. Several discussions of the issue resulted in the Pricing Committee's following Bear Stearns's assessment that the increased dilution level was not beyond the range of "the level of dilution that had been tolerated in other funds' rights offerings in the past." *Id.*

Finally, Strougo suggests that the defendant directors' motive in constructing the Rights Offering as they did was simply to raise fees for BEA, which earned a percentage of the Fund's net assets. BEA's fees were calculated at 1.0% of the first $100 million of the Fund's average weekly net assets. Using this ratio, the Rights Offering expected to raise $20 to $25 million in capital was expected to earn BEA $200,000 to $250,000. BEA is a firm with $28 billion in assets and earns $90 million in revenue each year. As Bassini told the SLC, raising an additional $200,000 to $250,000 for a firm of that size was "irrelevant" to the firm's overall profitability. Report Ex. 15.

Despite Strougo's contentions and as demonstrated by the SLC's Final Report, the SLC pursued its investigation in a thorough and diligent manner. From June through December 1998, the SLC interviewed 11 witnesses and conducted a comprehensive review of approximately 36,000 pages of documents. The SLC requested documents from Defendants throughout the course of its investigation and prepared memoranda of its interviews and meetings. The SLC's Report and the five volumes of exhibits thereto outline the SLC's reconstruction of the history of the events surrounding Strougo's allegations,

and the SLC's findings and conclusions based on its efforts. This is a reasonable investigation and thus, the SLC has demonstrated its good faith. *See Rosengarten*, 613 F.Supp. at 1501 (holding that special litigation committee acted in good faith based upon a 33–page report, several exhibits, interview summaries, meeting minutes and a chart of the movement and volume of the corporation's stock during the relevant time period); *Grossman*, 89 F.R.D. at 664 (holding that the special litigation committee's investigation, which spanned several months, was thorough based upon the documents it reviewed and the witnesses interviewed).

### 3. *The SLC Had Reasonable Bases For Its Conclusions*

 The SLC's reasoning in support of its conclusion that Strougo's derivative suit should be terminated is stated clearly in its Final Report and will not be reiterated in full detail here. Based on the SLC's investigation, the SLC concluded that (1) there is no basis in fact for the allegations set forth in the Strougo Complaint; (2) the Board reasonably concluded in mid–1996 that a rights offering was the best way for shareholders to take advantage of what were reasonably seen to be significant investment opportunities in Brazil; and (3) continuation of the lawsuit is not in the best interests of the Fund or its shareholders. In reviewing the SLC's conclusions, the Court does not take an independent look at the merits of the lawsuit, but must find that the SLC's consideration of the merits of the claims was reasonable. *See Lewis v. Fuqua*, 502 A.2d 962 (Del.Ch. 1985). In making this determination, the *Zapata* rule forces the court to rely upon the record generated by the SLC. *See Rosengarten*, 613 F.Supp. at 1502. Having reviewed the Final Report, there is ample support for the SLC's findings of fact and conclusion that BEA and the Fund's directors did not breach their respective fiduciary duties of loyalty and care by the development and implementation of the Rights Offering.

Strougo maintains that the SLC erroneously found that all of the witnesses it interviewed were "forthright and cooperative." The only evidence cited in support of this proposition is a portion of Vasarhelyi's deposition in which he recalls being "unimpressed" with a director the SLC interviewed. In the context of the deposition, Vasarhelyi's statement is better seen as a personal opinion as to that unnamed director's knowledge of the matter at hand rather than a comment on his candor and cooperativeness with the SLC.

Next, Strougo challenges the SLC's approval of the Board's substantive findings regarding the desirability and means of investing in Brazil. In arguing that it was not desirable to invest further in Brazil, Strougo repeats the argument that the SLC failed to investigate demand, an argument discussed and dismissed above. The SLC's extensive research into the internal conditions of Brazil was appropriate and sufficient to assess the desirability of investing there at the time the Rights Offering was considered.

Strougo then suggests that the SLC erred by finding that the Board was reasonable in its decision to opt for a Rights Offering plan and to structure it as nontransferable. The SLC's investigation made clear the fact that the directors inquired extensively into the options for raising capital as well as how to structure a rights offering. Report at 40–46, 50–51. Strougo next contends that the SLC was unreasonable in approving the non-transferable structure of the Rights Offering because the resulting dilution was higher than expected. The stock was diluted at a rate admittedly higher than expected, rising to 11.53% from a projected figure of 4.57%–6.55%. Report at 37, 38. Yet the SLC's mandate was not to judge the performance of the Rights Offering in hindsight, but rather to assess whether, at the time it was conceived and implemented, the defendants made an informed and reasonable market forecast based on diligent

investigation that reasonably appeared to further the shareholders' best interests. The Rights Offering did not perform as expected is undisputed, yet this was exactly the risk the Fund's shareholders took when they voluntarily opted to invest in the admittedly "volatile" Brazilian market. The directors based their decision on past rights offerings and a current analysis of Brazilian market indicators that indicated that, on average, non-transferable rights offerings resulted in lower dilution and lower stock price volatility than transferable rights offerings. Report at 54–55, 77–78.

Strougo has raised no issues of material fact weighing against a finding that the SLC had reasonable bases for its judgment.

### B. The Determination of the SLC Reflects Sound Business Judgment

■■ The Court may, in its discretion, undertake its own independent review of the merits of the derivative claim before approving the SLC's recommendation of dismissal. *Zapata*, 430 A.2d at 789. This discretionary second step is designed to prevent situations where a special litigation committee complied with the criteria in *Zapata*'s first step, but the outcome violates its spirit, or where a corporation's action would prematurely terminate a stockholder's grievance deserving further review in the corporation's interest. *Id.* The second step can be an "imprecise smell test" allowing the court to "search between the lines of the SLC's report of the scent of a meritorious claim enclosed within a record that has not been opened by truly adversarial proceedings." *Johnson*, 811 F.Supp. at 490. The Court must determine, through the exercise of its independent business judgment, whether the facts and law establish that continuing the derivative litigation will benefit the corporation on whose behalf the derivative claim is brought. *See id.*

In the Court's view, Strougo's core liability theory—that the Defendants breached their respective fiduciary duties of loyalty and care by the development and implementation of the Rights Offering—is unlikely to prevail. The existence of available and realistically discoverable evidentiary support for the propositions that the interests of BEA took precedence over the interests of the Fund and its shareholders and/or that defendants failed to act "advisedly with due care, as well as in good faith," *King v. Douglass*, 973 F.Supp. 707, 718 (S.D.Tex.1996), lacks the persuasive force necessary for Strougo to prevail.

■ Although damages do not speak directly to the question raised by this motion, whether SLC members were independent and conducted a diligent investigation in good faith, the Court may review the direct costs and benefits of litigation for the corporation under *Zapata*'s second step. *Joy*, 692 F.2d at 892.

Strougo contends that by approving the Rights Offering, the Defendants caused "but for" damages of between $16 million and $62 million. Strougo proposes two measures by which to assess damage to the Fund. First, he argues that "but for" damages can be computed by comparing the NAV or stock price before the Rights Offering to the NAV or stock price three years after the Rights Offering. The three-year timespan is taken from Bassini's comment to the SLC that dilution would be acceptable if the Fund could generate 25% returns per year over three years. Comparing the Fund's NAV prior to the closing of the Rights Offering ($17.24) with the Fund's NAV three years later ($9.75, comprising the NAV of $.64 plus income and capital gain distributions of $5.11 made during the three-year period), and multiplying the difference by 4,634,005, the number of Fund shares outstanding prior to the Rights Offering, Strougo's expert arrives at a dilution damage figure of $34,704,063. Marek Aff. at 8–9.

Second, Strougo assesses damages by comparing the market price of the Fund's shares at the beginning of the Rights Offering and three years later, again choosing the three-year timespan based on Bassini's comment. Using a market price of $13.50 prior to the Rights Offering and a market price (including income and capital gain distributions made during the intervening period) of $9.7975, Strougo's expert assesses dilution damages to be $17,152,-770.

Both methods Strougo uses to value loss depend on a three-year interval that has no bearing on the actual loss, if any, incurred by the Rights Offering. Strougo offers no support for his contention that the value of NAV and stock prices three years after the Rights Offering were a product of the Rights Offering itself rather than other, subsequent market forces.

On the other hand, the Fund notes that both its stock price and per-share NAV returned to their pre-Rights Offering levels within three to five months after the end of the subscription period. Report at 74. Short-term NAV dilution is mathematically inherent in any rights offering. As described in the Report, shares of closed-end funds trade on the open market at a premium or discount to their net asset value (NAV), which equals the Fund's total net assets divided by the number of shares. Rights offerings are inherently NAV-dilutive in the short-term because new shares are added to the fund at a price below NAV. Report at 73.

■ Finally, Strougo enumerates losses to individual shareholders who could otherwise have invested in more profitable enterprises. Yet this "lost opportunity" consideration is not relevant in this derivative action, which seeks to assess losses to the corporation rather than individual shareholders. *See Padegs*, 27 F.Supp.2d at 455 n. 8.

As Strougo offers no supportable theory of damages that could be recouped by continued litigation, *Zapata*'s second step also weighs in favor of the Fund.

Having exercised the second-step review, there is no basis on the grounds of business judgment to permit this action to go forward. The findings and conclusions of the SLC have been made independently, reasonably and in good faith, thus satisfying the spirit of the *Zapata* standard. Moreover, this stockholder grievance does not merit further consideration in the corporation's interest.

### Conclusion

For the reasons set forth above, Defendants' motion to terminate the derivative action is granted.

It is so ordered.