Robert STROUGO, Plaintiff,

v.

BEA ASSOCIATES, Defendant,

and

The Brazilian Equity Fund, Inc., Nominal Defendant.

No. 98 CIV 3725 RWS.

United States District Court, S.D. New York.

Feb. 21, 2002.

Wechsler Harwood Halebian & Feffer, New York City (Joel C. Feffer, Daniella Quitt, of Counsel), Rubin & Rubin, Chartered, Rockville, MD (Ronald B. Rubin, of Counsel), for Plaintiff.

Willkie Farr & Gallagher, New York City (Lawrence O. Kamin, of Counsel), for Defendant Bea Associates.

## OPINION

SWEET, District Judge.

Defendant Credit Suisse Asset Management LLC ("CSAM"), formerly known as BEA Associates, the investment adviser for the Brazilian Equity Fund, Inc. (the "Fund"), has moved under Rule 56, Fed. R.Civ.P., to dismiss the Second Amended

Complaint (the "Complaint") of plaintiff Robert Strougo ("Strougo"), a shareholder in the Fund, which alleged violations of Section 36(a) and 36(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. § 80a–35(a), (b). For the reasons set forth below, the motion is granted.

Strougo has been a determined litigant, attacking various practices of the Fund and related entities in an effort to remedy what he perceives as the "abysmal" performance of the Fund and its continued existence despite a market value consistently below its net asset value ("NAV"), sometimes referred to as its discount. These efforts have included, in addition to the instant action, a shareholder derivative claim against BEA Associates and the Fund's directors for alleged violations of the ICA in the Fund's 1996 rights offering, see *Strougo v. Bassini*, 112 F.Supp.2d 355 (S.D.N.Y.2000), and a similar action challenging a 1995 rights offering by the Brazil Fund, a separate closed-end fund, see *Strougo v. Padegs*, 27 F.Supp.2d 442 (S.D.N.Y.1998).

Despite a preliminary success in the *Padegs* action, see *Strougo v. Padegs*, 964 F.Supp. 783 (S.D.N.Y.1997) (denying motion to dismiss fiduciary duty and ICA "control person" claims, except with regard to certain defendants), the decisions have not been favorable to the investor against whom the authorities are currently stacked. While the current revelations concerning the Enron Corporation challenge the validity of many of the precepts of corporate governance, the precedents remain in favor of the board of directors and the adviser.

### Prior Proceedings

The original complaint was filed on May 21, 1998. It alleged violation of ICA Section 36(b) based upon the non-employee directors' lack of independence. The com-plaint was dismissed with leave to replead. *Strougo v. BEA Assoc.*, No. 98 Civ. 3725(RWS), 1999 WL 147737, at *2 (S.D.N.Y. Mar.18, 1999).

On April 2, 1999, Strougo filed his first amended complaint. This complaint restated the sole claim in the original complaint, *i.e.*, that the agreement between the Fund and CSAM is void because the Fund failed to maintain the requisite number of independent directors, but pursuant to ICA Section 36(a), rather than ICA Section 36(b). Strougo's claim was based on the lack of independence of the directors as a result of their multiple directorships, their substantial compensation, and their conduct in seeking to prevent the Fund's shareholders from voting to remove CSAM as the Fund's investment adviser. The first amended complaint contained allegations describing: (i) the duties borne by independent directors of a registered investment company; (ii) industry and professional literature cautioning against multiple directorships; (iii) the resulting practical inability of directors serving on multiple boards to fulfill their roles as "watchdogs"; (iv) structural reasons why the "independent" directors serve at the pleasure of the defendant, rather than the Fund's shareholders; and (v) specific examples of these directors' docility in the face of CSAM's overreaching. It added a second claim under ICA Section 36(b), alleging "excessive or inappropriate compensation."

Following CSAM's second motion to dismiss, this Court sustained the first amended complaint, subject to Strougo adding the Fund as a nominal defendant. *Strougo v. BEA Assoc.*, No. 98 Civ. 3725(RWS), 2000 WL 45714 (S.D.N.Y. Jan.19, 2000), and the Second Amended Complaint was filed on February 3, 2000, which added the Fund as a nominal defendant.

Discovery commenced and certain disputes were resolved. *Strougo v. BEA Assoc.*, 199 F.R.D. 515 (S.D.N.Y.2001). The instant motion for summary judgment was heard on November 7, 2001, and marked fully submitted at that time.

### The Facts

The facts are taken from CSAM's Statement of Undisputed Facts pursuant to Rule 56.1 of the Local Rules, Strougo's Statement of Disputed Issues, and the affidavits, depositions, and exhibits submitted by the parties. These facts are undisputed except as noted.

CSAM, then known as BEA Associates, established the Fund as a non-diversified, closed-end investment company, organized under the laws of the State of Maryland. It is a registered investment company under the Investment Company Act of 1940 ("ICA"), 15 U.S.C. §§ 80a–1 *et seq.*, with an investment objective of long-term capital appreciation, and its investment mandate requires it to invest primarily in Brazilian securities. The Fund's shares trade on the New York Stock Exchange.

Although the Fund is "non-diversified," it is subject to Brazilian regulations limiting investments in any single issuer, and the Internal Revenue Code, which prohibits the Fund from investing, with respect to fifty percent of its assets, any more than five percent in any one issuer. Brazilian regulations require that the Fund retain a local administrator, and impose certain taxes on the Fund.

The Fund's performance has largely moved with the Brazilian stock market. During 1998, the main Brazilian exchange, the Sao Paulo Exchange, had its worst performance in over twenty-five years, with a loss of 33.5 percent. For the six months ending September 30, 1998, the Morgan Stanley Capital International Brazil Index fell 44.3 percent.

CSAM serves as the Fund's investment adviser under a contract between the Fund and CSAM known as the Investment Advisory Agreement (the "Agreement"). CSAM manages assets of over $300 billion and serves as adviser to fifty-four open-end and eight closed-end funds, including the Fund. Pursuant to the Agreement, CSAM, among other things, manages the Fund's assets in accordance with the Fund's investment mandate and all applicable laws and regulations, provides research, makes investment decisions, and exercises voting rights with respect to securities held by the Fund.

Previously, CSAM and Garantia Administracao de Recursos ("Garantia"), the Fund's subadviser, were paid a fee equivalent to 1.35 percent of the first $100 million of the Fund's net assets. Garantia resigned as the Fund's subadviser in 1994, and CSAM assumed Garantia's responsibilities but declined to charge the portion of the fees that would have been otherwise payable to Garantia. The fee of one percent of the first one hundred million of Fund assets, which CSAM continued to receive under that structure, is within the median of fees received by managers of world equity funds.

As of 2000, under a new fee structure, CSAM's fee is based on the lesser of the Fund's average net assets or the market value of the Fund's shares. CSAM charges lower fees to institutional clients. These fees are negotiated at arm's length.

For the fiscal years ending March 31, 1997, 1998, 1999, 2000, and 2001, CSAM earned $914,200, $1,020,507, $420,08, $364,721, and $341,921, respectively, in fees. CSAM's profit margin for the years 1996, 1997, 1998, 1999 and 2000 was 18 percent, 57 percent, 11 percent, negative 102 percent, and negative 24 percent, respectively.

The Fund's operating expenses include expenses associated with investments in Brazil. The Fund's expense ratio is affected by the small size of the Fund and certain expenses associated with its closed-end structure, such as exchange listing fees and fees associated with the annual proxy solicitation, and the significant fees associated with the present litigation, as well as expenses related to Brazilian investment including higher custodian, accounting, and audit fees, the mandatory retention of a Brazilian administrator, and a Brazilian transaction fee of up to .38 percent. For the Fund's fiscal years 1996, 1997, 1998, 1999, 2000 and 2001, its expense ratios were 1.76%, 1.76%, 2.07%, 5.17%, 3.80% and 2.38%. Strougo's litigation has attributed 0.09%, 2.34%, 0.87% and 0.28% respectively to those amounts. CSAM also provides, at cost, administrative services to the Fund under an Administrative Services Agreement, including internal executive and administrative services, responds to shareholder inquiries, a closed-end fund website, and corporate secretarial services.

During the relevant time period, the Fund's board of directors was composed of eight directors. The six outside directors have been Dr. Enrique Arzac ("Arzac"), James J. Cattano ("Cattano"), George W. Landau ("Landau"), Robert J. McGuire ("McGuire"), Martin M. Torino ("Torino") and Miklos A. Vasarhelyi ("Vasarhelyi"). None of the outside directors are disqualified from being a non-interested director under Section 2(a)(9)(b) of the ICA by virtue of family relationship, having an interest in any security issued by CSAM, acting as legal counsel to CSAM, or having been determined by the SEC to be an interested person.

Arzac is a professor of finance and economics at the Graduate School of Business of Columbia University. Landau is a senior adviser to the President of the Latin American Group of the Coca–Cola Corporation, and a former U.S. Ambassador to Venezuela, Chili and Paraguay. Torino is the chairman of the board of directors of Ingenio y Refineria San Martin Del Tabacal S.A., an Argentine sugar refinery, and an executive director of TAU S.A., an Argentine commodities trading firm. Cattano is the president of Primary Resources Inc., a trading firm that specializes in Latin American agricultural commodities. Cattano and Torino were formerly colleagues at Marc Rich & Co., along with Michael Pignataro, Chief Financial Officer and Secretary of the Fund, and Bassini, a former member of the board and current Chief Executive Officer of the Fund.

The Fund utilizes a staggered board divided into three classes, each class having a term of no more than three years. Except for the addition of McGuire and Vasarhelyi, who constituted the Litigation Committee, the membership has been constant.

Arzac, Landau, Cattano, and Torino currently serve as directors of eight, five, four, and three CSAM-affiliated funds, respectively. The board meetings as a rule take two to three hours and are held jointly with the other CSAM affiliated funds. There are over 100 agenda items, many of a routine nature.

The Fund's board of directors sets the compensation paid to directors for service on the Fund's board and the directors on the Fund's board receive $5,000 per year of service on the board, and $500 for each meeting attended by the director. Pursuant to a decision made by the Fund's board, as of May 8, 2000, the directors will receive 50 percent of their fees in the form of Fund shares. In the fiscal year ending March 31, 2001, the four outside directors who serve on other boards of fund compa-

nies advised by CSAM earned the following compensation for their services on all CSAM-advised fund boards: Arzac, $107,250, Cattano, $48,500, Landau, $55,000, and Torino, $40,500. According to Arzac, these fees amount to approximately 15% of his income and a *de minimus* percentage of his net worth. The other directors have made statements similar in import.

In 1998, a shareholder proposal to terminate the Agreement was submitted to the Fund's shareholders over an initial board opposition. The shareholders rejected that proposal. Also in 1998, the outside directors approved a share repurchase program and the Fund repurchased approximately $2 million worth of shares as of February 2000. In 2000, the outside directors, in their capacity as directors of other funds advised by CSAM, voted to merge the Latin American Investment Fund, Inc. into the Latin American Equity Fund, Inc. and the Emerging Markets Infrastructure Fund, Inc. into the Emerging Markets Telecommunications Fund, Inc. The mergers reduced the total compensation paid the directors by the Fund advised by CSAM.

In November of each year, the Fund's board meets to decide whether to renew the Agreement with CSAM. Within a week of each of these meetings, the directors receive a package of materials from CSAM. In particular, they receive information regarding, among other things, (i) a description of CSAM; (ii) an analysis of the profitability to CSAM for advising the Fund and the other closed-end funds that it advises; (iii) financial information relating to the Fund, including total return and market price data for the Fund's shares; (iv) data regarding fees paid by other CSAM clients; (v) a comparison of the advisory fee and expense ratio for the Fund with other similar funds prepared by

Lipper, Inc., and (vi) a comparison of the performance of the Fund with that of other CSAM-managed funds and other registered and unregistered investment companies and the closest appropriate index. In every year since 1992, the board has renewed the Agreement with CSAM, and CSAM has continued as the Fund's adviser.

The outside directors have retained PaineWebber to make recommendations regarding the methods the Fund could implement to reduce its discount rate.

### Discussion

### I. Applicable Law

### A. The Standard for Summary Judgment

On a motion for summary judgment, the movant has the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking to fend off a summary judgment motion must respond by setting forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should be granted where the moving party demonstrates that there is no genuine issue of material fact regarding the claims at issue and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. The Investment Company Act

The ICA is a statute enacted by Congress in response to concerns that existing securities laws did not protect mutual fund shareholders from potential abuse by fund advisers, whose relationships with the funds they manage are " 'fraught with po-

tential conflicts of interest.'" *Burks v. Lasker*, 441 U.S. 471, 481, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979) (internal quotations omitted). With this in mind, Congress incorporated fiduciary duties into the ICA through Section 36(a), which allows actions against persons who have engaged in, or who are about to engage in "any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company . . . ." 15 U.S.C. § 80a–35(a).

Certain provisions of the ICA are relevant to the Section 36(a) claim brought in this action. Section 10(a) of the ICA, 15 U.S.C. § 80a–10(a), requires that at least 40% of the members of the board of directors of a mutual fund not be "interested persons." Section 15(c), 15 U.S.C. § 80a–15(c), requires that a majority of the disinterested directors approve agreements between a fund and a fund's investment adviser.

The ICA lays out several tests to determine whether a person is considered to be an "interested person" of an investment adviser. Under the first of these tests, the most applicable to the instant motion, an "interested person" is "any affiliated person" of an investment adviser or principal underwriter. 15 U.S.C. § 80a–2(a)(19)(B). An "affiliated person" is defined as "any person directly or indirectly controlling, controlled by, or under common control with such other person." *Id.* § 80a–2(a)(3)–(c). "Control," in turn, is defined as "the power to exercise a controlling influence over the management or policies of a company." *Id.* § 80a–2(a)(9). To defeat summary judgment on the Section 36(a) claim, Strougo must establish that CSAM is "control ling" the independent directors or raise a factual issue with respect to such control.

Section 36(b), a narrower provision of the ICA, imposes a fiduciary duty on the investment adviser not to charge excessive fees and creates a private right of action by a shareholder against the adviser for a breach of this duty. In pertinent part, Section 36(b) states:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services . . . An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser . . . for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company . . . .

15 U.S.C. § 80a–35(b).

As this Court has held, Strougo must ultimately demonstrate that CSAM's fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Strougo v. BEA Assocs.*, No. 98 Civ. 3725(RWS), 1999 WL 147737, at *7–8 (S.D.N.Y. March 18, 1999) (quoting *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir.1982)).

## II. *Summary Judgment is Appropriate*

### A. *Summary Judgment is Not Defeated on the Basis of Discovery Improprieties*

As a preliminary matter, Strougo has urged that summary judgment is not appropriate because of CSAM's discovery abuses, ranging from failure to identify the experts who submitted affidavits in support of its summary judgment motion to failure to produce documents. However, there is no requirement that a party disclose its experts prior to filing a motion for

summary judgment. Fed.R.Civ.P. Rule 26 states that the disclosure of a party's expert witness shall be made:

> at the times and in the sequence directed by the court. In the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial . . . .

Fed.R.Civ.P. 26(a)(2)(C).

▮ Moreover, Strougo has not shown that CSAM's failure to disclose the identity of its experts was made in bad faith or that it resulted in such prejudice that the drastic remedy of exclusion would be warranted. *See* Fed.R.Civ.P. 37(c)(1) (exclusion should not apply if the failure was "harmless"); *Hinton v. Patnaude,* 162 F.R.D. 435, 439 (N.D.N.Y.1995) (no exclusion if harmless and conduct was not in flagrant bad faith). Strougo did not request depositions of CSAM's experts although he had nearly three months after CSAM filed its motion for summary judgment to do so. Any prejudice caused by untimely disclosure was remedied by the availability of those months during which plaintiff could depose the expert. Finally, Strougo could have retained and designated his own rebuttal experts.

Strougo has noted that Cattano, a nonparty witness, failed to bring materials regarding the November 2000 board meeting to his deposition on November 27, 2000. With respect to that November 2000 meeting, Strougo was given a copy of all board materials within weeks of the meeting date by CSAM itself. Were there any discovery problems, it was incumbent upon Strougo to notify CSAM, and to follow the Court's procedures for resolving disclosure issues. *See* Local Rules of the United States District Court for the Southern and Eastern Districts of New York, Rule 37.2 (outlining procedure to bring discovery dispute). Summary judgment cannot be defeated on the basis of discovery improprieties.

If there are no material facts in dispute, under these principles, summary judgment is appropriate.

## B. *Under the Controlling Authority the Directors Are Not Interested*

In his Section 36(a) claim, Strougo asserts that CSAM has breached its fiduciary duty to the Fund because it accepted compensation under an invalid advisory agreement. He argues that the Agreement is invalid because the outside directors on the Fund's board are not independent of CSAM, thus running afoul of the ICA's requirement that advisory agreements be approved by independent directors. The circumstances that he alleges contribute to a lack of independence include: (i) service on Multiple CSAM-advised boards; (ii) failure to terminate CSAM, oppose CSAM, or lower CSAM's fees; (iii) insufficient attention to duty as a result of other, full-time occupations; (iv) insufficient information to monitor CSAM; and (v) dependency on CSAM for board positions as a result of staggered terms and re-election procedures. As mentioned before, to defeat summary judgment on his Section 36(a) claim, Strougo must establish that CSAM is "controlling" the independent directors or raise a factual issue with respect to such control.

The ICA specifically provides that "[a] natural person shall be presumed not to be a controlled person." *Id.* § 80a–2(a)(9). Courts have held that the burden to overcome this presumption is a heavy one. *See, e.g., Olesh v. Dreyfus Corp.,* 1995 WL 500491, at *16 (E.D.N.Y. Aug.18, 1995); *Rome v. Archer,* 197 A.2d 49, 54 (Del. 1964). *See also In re Fundamental Investors Inc.,* ICA Release No. 3596 [1961–64 Transfer Binder] Fed. Sec. L. Rep. (CCH)

¶ 76,887, 81,272 (Dec. 27, 1962) ("The burden of overturning the presumption against control of a natural person is not one that will be lightly assumed or easily carried to success.").

Nevertheless, there is some support for the position that the terms "control" and "controlling influence," as used in § 80a–2(a)(9) of the ICA, might extend beyond "actual" control.[1] The history behind the ICA indicates that the SEC has in the past found that controlling influence encompasses "influence" that is "less than absolute and complete domination," *In re M.A. Hanna Co.*, ICA Rel. No. 265, 1941 WL 37412, at *5 (Nov. 26, 1941). The agency indicated that Section 2(a)(9) included "the latent power to exercise a controlling influence as well as the active exercise of such power." *In re Transit Inv. Corp. & Broad St. Trust Co.*, ICA Rel. No. 927, 1946 WL 24141, at *8 (July 30, 1946). *Accord The First Australia Fund, Inc.*, SEC No–Action Letter, [1987–1988 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 78,551, at 77,-795 n. 11 (Oct. 8, 1987); *Moses v. Black*, No. 78 Civ.1913, [1981 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,866, at 90,-366 (S.D.N.Y. Feb. 3, 1981).

The SEC's report to Congress that served as the basis for the ICA emphasized that "control" or "influence" can assume many different forms, and often can be proven only by circumstantial evidence. *See In re Chicago Corp.*, ICA Rel. No. 1203, 1948 WL 29459, at *3–4 n. 7 (Aug. 24, 1948) (*citing* H. Doc. 246, 77th Cong., S.E.C. Reports on Investment Trusts and Investment Companies, Part Four, at 2). The SEC concluded that, in light of the legislative history and overall purposes of the ICA, "the statutory concept of control embraces within it those pressures and influences, at times admittedly delicate, by which an investment company can exercise a dominating persuasiveness in the affairs of the portfolio company." *Chicago Corp.*, 1948 WL 29459, at *4.

■ More recently, in *Verkouteren v. Blackrock Fin. Management, Inc.*, 37 F.Supp.2d 256 (S.D.N.Y.1999) ("*Verkouteren I*"), the Honorable Whitman Knapp, faced at the pleading stage the same issue presented to this Court, namely the degree of control, and the adequacy of mere "influence," sufficient to overcome the presumption of independence possessed by a natural person. He reiterated the factors set forth by the SEC in the *First Australian Fund, Inc.*, Sec No–Action Letter, 1987 WL 108483 [1987–1988 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 78,551 (Oct. 8, 1987), as follows:

(1) selection or nomination of the director by the controlling party; (2) existence of family ties; (3) social relations; (4) former business associations between the director and the controlling person; (5) the amount of time spent by directors at meetings; (6) respective ages; (7) participation in recommending, evaluating, and terminating policies; (8) independent knowledge of corporate affairs; (9) interlocking directors and officers, together with share ownerships; and (10) actual domination and operation.

*Verkouteren I*, 37 F.Supp.2d at 261.

■ Certain of these factors appear to be implicated by the facts established above. At the outset, it is presumed that CSAM initially selected the directors who have remained in office, triggering factor (1). Factor (4) also appears to be implicated as there have been a number former

1. Both the courts and the SEC share concurrent jurisdiction to determine whether the presumption has been rebutted. *See SEC v. S & P Nat'l Corp.*, 360 F.2d 741, 748–49 (2d Cir.1966); *Willheim v. Murchison*, 342 F.2d 33, 42 n. 6 (2d Cir.1965).

business relationships among the leaders of CSAM and the Fund. Factor (5) appears to be triggered by the fact that board meetings consisting of agenda items from all of the various CSAM funds are routinely brief. There is evidence supporting doubt as to director participation and independent knowledge, factors (7) and (8), and the interlocking directorships, factor (9), have been discussed at length.

However, in *Verkouteren I*, Judge Knapp concluded that factors (1) and (5) were not dispositive, particularly in view of the importance he placed on factor (10), actual domination. After repleading, Judge Knapp again dismissed the amended complaint although additional indicia were set forth, some of which have been presented here. He concluded:

> Unfortunately, those indicia could just as easily be rooted in other causes, such as ineffective performance by the directors of their duties or in attentiveness on the part of the shareholders of the funds in supervising the directors. Similarly, the alleged malignancies in the corporate by-laws clearly suggest that defendant *could* impose pressure on the outside directors to acquiesce to its wishes; they do not, however, suggest that defendant *did* impose that pressure.

*Verkouteren v. Blackrock Fin. Management, Inc.*, 1999 WL 511411 (S.D.N.Y. 1999) ("*Verkouteren II*"). This reasoning, emphasizing actual domination, was affirmed by the Court of Appeals in an unpublished opinion, 208 F.3d 204, 2000 WL 298255 (2d Cir.2000), and has been used by other courts. *See, e.g., Olesh*, 1995 WL 500491, at *16 (Proof of control "'demands a presentation of evidence establishing actual domination and operation. Mere influence would fall short of this level of proof.'") (*quoting Acampora v. Birkland*, 220 F.Supp. 527, 543 (D.Colo. 1963)).

Applying this reasoning to the instant action, the specific circumstances presented by Strougo are insufficient to establish "control." As the above authorities establish, service on multiple boards alone does not constitute control. With respect to the termination of CSAM and the continuation of its fees, Strougo has criticized the directors for contacting the SEC with respect to a proposed vote to terminate CSAM's advisory contract, but CSAM has advanced several good faith explanations for the board's actions. No additional information has been specified to demonstrate the directors' alleged ignorance, and no authority has held that full-time occupations and two-hour meetings sufficiently state a claim of inattention to duty. In view of their outside employment, the fees paid fail to overcome the presumption of independence. In the case of Arzac, who received the largest amount of fees, it cannot be said that a triable issue has been created. The remaining fees are within the range for directors' fees that have been acceptable under the applicable law. *See, e.g., Migdal v. Rowe Price–Fleming Int'l Inc.*, No. 00 Civ. 1420, 2001 WL 460752, at *5–6 (4th Cir. May 1, 2001) (dismissing claim alleging control where disinterested directors served on the boards of between twenty-two and thirty-eight other related funds and received $65,000 or $81,000 for their services); *Krantz v. Prudential Inv. Fund Management LLC*, 77 F.Supp.2d 559, 563 (D.N.J. 1999) (dismissing claim that overlapping service on multiple boards of funds advised by the same adviser with an aggregate compensation of up to $135,000 rendered outside directors interested under the ICA); *Olesh*, 1995 WL 500491, at *21 (compensation of over $50,000 did not render directors interested).

Strougo cites the director approval of the 1996 rights offering, in which the re-

sulting dilution exceeded that originally forecast, as further evidence of control. However, this issue has been litigated and dismissed. *See Strougo v. Bassini*, 112 F.Supp.2d 355 (S.D.N.Y.2000). Strougo did not mention these allegations in the Complaint, and the Court has found that the Fund's directors had a reasonable basis for their actions. *See id.* Strougo also cites a by-law change to give the board exclusive power to amend the by-laws, and an increase in the number of shares required to request a special shareholders' meeting as evidence of control by CSAM. CSAM has explained that these are issues of corporate governance resulting, in part, from changes in the Maryland law.

In the present climate surrounding corporate governance, some of the statements cited by Strougo may well reflect the realities of the marketplace. According to Warren Buffett, the legendary investor and chairman of the Berkshire Hathaway Group:

> I think independent directors have been anything but independent. The Investment Company Act, in 1940, made these provisions for independent directors on the theory that they would be the watchdogs for all these people pooling their money. The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management—whether management was good, bad, or indifferent. Not negotiate for fee reductions and so on. A long time ago, an attorney said that in selecting directors, the management companies were looking for Cocker Spaniels and not Dobermans. I'd say they found a lot of Cocker Spaniels out there.

Haywood Kelly, A Quick Q & A with Warren Buffett, *Morningstar* (May 6, 1998).

A realistic and common sense appraisal of the duties and performance of these directors might well raise a triable issue of influence approaching control, but given the alternative basis for the directors' act advanced by CSAM and set forth in the facts found above under *Verkouteren I* and *Verkouteren II*, summary judgment seems required.

### C. *Excessive Fees Have Not Been Established*

█ The parties agree that the standard for determining fee excessiveness is set forth in *Gartenberg v. Merrill Lynch Asset Management*, 694 F.2d 923 (2d Cir. 1982). As this Court has stated, *Gartenberg* requires a plaintiff alleging a Section 36(b) violation to demonstrate that an adviser's fee "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Strougo v. BEA Assocs.*, No. 98 Civ. 3725(RWS), 1999 WL 147737, at *7–8 (S.D.N.Y. March 18, 1999) (*quoting Gartenberg*, 694 F.2d at 928). Under this standard, the courts weigh the following factors: (1) the nature and quality of services, (2) profitability to the adviser, (3) fall-out benefits, (4) economies of scale, (5) comparative fee structures, and (6) the conscientiousness and care of the directors in approving the fee. *Krinsk v. Fund Asset Management*, 875 F.2d 404, 409 (2d Cir.1989) (*citing Gartenberg*, 694 F.2d at 929–30).

█ Without a direct attack on CSAM's services, Strougo reiterates the discount and the Fund's poor performance in 1997 and 1998. However, performance of the Fund, like the rest of the *Gartenberg* factors, must be viewed "in the light of all of the surrounding circumstances." *Gartenberg*, 694 F.2d at 928. The Fund's performance has been negatively impacted by investment restrictions imposed on the Fund and the overall performance of the

Brazilian market in which the Fund is required to invest. Given these circumstances, this factor does not support Strougo's claim.

Strougo has not submitted evidence to dispute CSAM's showing that the Fund's fees and expenses are within the range of fees and expenses for similar funds. Without raising additional *Gartenberg* factors, Strougo raises claims of excessiveness under Section 36(b) based on that fact that the fees were not negotiated at arm's length, are higher than those charged to institutional clients, and the Fund should be closed altogether.

■ However, it has long been established that there is no requirement to actually negotiate fees at arm's length. *See Gartenberg*, 694 F.2d at 928; *see also* S.Rep. No. 91–784 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897 (arm's length bargaining not practicable in mutual fund industry). Rather, the standard is "whether the fee schedule represents a charge within the range of what *would have been* negotiated at arm's length in light of all the surrounding circumstances." *Gartenberg*, 694 F.2d at 928 (emphasis added).

■ Strougo has presented evidence that CSAM has a different fee structure for its institutional clients. It has been held that relevant comparison must be to other mutual funds, not to non-mutual fund institutional clients. *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F.Supp. 962 (S.D.N.Y.1987), *aff'd*, 835 F.2d 45 (2d Cir.1987).

Strougo has claimed that CSAM has kept the Fund in existence to "advance CSAM litigation strategy." However, whether the Fund is separate or its assets are part of a merged fund, its fees would be identical.

Although Strougo has maintained that the directors did not have all the informa-

tion necessary to come to an informed decision regarding the renewal of the Agreement, no relevant information the directors should have received and did not, or any material submitted to the directors by CSAM that was misleading, has been identified.

While the issue of the lower charge made by CSAM to institutional clients might in a first instance produce a triable issue, it no longer does in view of *Gartenberg* and *Schuyt*. Under the authorities and despite misgiving, summary judgment is appropriate to dismiss the excessive fee claim.

### Conclusion

For the foregoing reasons, the defendant's motion to dismiss the Second Amended Complaint is granted.

It is so ordered.